UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA EX REL. JASON S. MIYARES, ATTORNEY GENERAL, ) ) ) ) | |
| Plaintiff, ) ) ) | |
| vs. ) ) | |
| WILLIAM JAYSON WALLER, ) ) | COMPLAINT |
| KEVIN ANTHONY KLINK, ) ) | Case No. 3:26cv00309 |
| CROSS RIVER BANK, a New Jersey-chartered Bank ) ) ) | JURY TRIAL DEMANDED |
| FIFTH THIRD BANK, a National Association ) ) ) | |
| GOODLEAP, LLC, a California limited liability company ) ) ) | |
| SOLAR MOSAIC LLC, by and through the Plan Administrator, Olive Advisors LLC ) ) ) ) | |
| SUNLIGHT FINANCIAL LLC, a Delaware limited liability company ) ) ) | |
| and ) ) | |
| TECHNOLOGY CREDIT UNION, a California-chartered Credit Union ) ) ) | |
| Defendants. ) | |

I. SUMMARY

1.     The federal Consumer Financial Protection Act and the Virginia Consumer Protection Act prohibit deception by those engaged in consumer lending.  Defendants deceived

1

over 4,000 Virginia consumers into taking out over $200 million in loans to purchase high-priced solar systems by claiming the systems would save consumers enough money to afford the loans needed to buy them, when, in fact, Defendants knew purchasers would lose money initially and for years to come.

2.      The Consumer Financial Protection Act prohibits regulated entities from violating the Truth in Lending Act, which requires disclosure of consumer loan fees.  Defendants charged hidden loan fees of 5-33%, pretending the fees were part of the solar system costs, when they were not.

3.      Hiding loan fees was also a deceptive practice under the federal Consumer Financial Protection Act and the Virginia Consumer Protection Act.

## II. PARTIES, AUTHORITY AND REQUIRED NOTICES

### A.  Plaintiff

4.      The Plaintiff is the Commonwealth of Virginia by and through Attorney General Jason S. Miyares.

### B.  Plaintiff's Authority to Bring Federal and State Claims

5.      The Plaintiff has authority to bring this action under the Consumer Financial Protection Act of 2010, 12 U.S.C §§ 5536(a)(1)(A)-(B), 5552, and 5565(b), which authorizes state Attorneys General to bring actions for deceptive loan practices and actions for violations of other federal consumer financial laws, including the Truth in Lending Act, 15 U.S.C. § 1601, *et seq*., and its implementing regulations.  The Virginia Consumer Protection Act, Virginia Code § 59.1-196 *et seq*. additionally authorizes the Attorney General to bring this action.

## C. Defendants

6.      Defendant William Jayson Waller is an individual who served as Power Home Solar, LLC d/b/a Pink Energy's (Power Home's) Chief Executive Officer.  He resides in Davidson, North Carolina.

7.      Defendant Kevin Anthony Klink is an individual who served as Power Home's Chief Financial Officer.  He resides in Mooresville, North Carolina.

8.      Defendant Cross River Bank is a New Jersey chartered bank with a principal place of business at 2115 Linwood Avenue, Fort Lee, New Jersey 07024.

9.      Defendant Fifth Third Bank is a National Association with its headquarters and principal place of business at 38 Fountain Square Plaza, Cincinnati, Ohio 45263.  By merger it is the successor of Dividend Solar Finance LLC (Dividend), whose conduct is at issue here.  All references to Dividend apply to Fifth Third Bank as Dividend's successor by merger.

10.      Defendant GoodLeap, LLC, (GoodLeap) formerly known as LoanPal LLC, is a California limited liability company with its principal place of business at 8781 Sierra College Boulevard, Roseville, California 95661.

11.      Defendant Solar Mosaic LLC (Mosaic) is a Delaware limited liability company with its principal place of business at 601 12th Street, Suite 325, Oakland, California 94607. After the September 2025 approval and confirmation of the Plan in the Chapter 11 bankruptcy proceeding, *In re: Mosaic Sustainable Finance Corp., No. 25-90156* (Bankr. S.D. Tex) (see Docket Entry 671), it is named through its bankruptcy Plan Administrator, Olive Advisors LLC.

12.      Defendant Sunlight Financial LLC (Sunlight) is a Delaware limited liability company with its main office at 101 North Tryon Street, Suite 900, Charlotte, North Carolina 28246.

3

13.      Defendant Technology Credit Union is a California-chartered credit union with its principal place of business at 2010 North First St., San Jose, California 95131.

14.      Collectively, this Complaint will use "Lenders" to refer to Cross River Bank, Fifth Third Bank / Dividend, GoodLeap, Mosaic, Sunlight Financial, and Technology Credit Union.

**D. Reasons for Nonjoinder of Power Home Solar, LLC**

15.      Power Home was a Delaware limited liability company whose headquarters and principal place of business were in Mooresville, North Carolina.  It filed for Chapter 7 bankruptcy on October 7, 2022.  The bankruptcy proceeding, *In re: Power Home Solar, LLC, No. 22-50228* (Bankr. W.D.N.C.), is still pending. Further, as Power Home is subject to the Bankruptcy Court's jurisdiction and protections, naming Power Home in this action could subject it to incurring obligations that are multiple or inconsistent with the bankruptcy proceeding. Moreover, the parties in this case can provide the complete relief sought by the Plaintiffs, including the relief described below.

**E. Relief Sought**

16.      As authorized by 12 U.S.C. § 5565(a)(1) and Virginia Code §§ 59.1-203, -205, and -206, Plaintiff seeks permanent injunctive relief, contract rescission or reformation, restitution, disgorgement or compensation for unjust enrichment, payment of damages or other monetary relief, public notification regarding the violation, including the costs of notification, civil penalties, attorneys' fees, expenses, and other equitable and statutory relief for Defendants' violations of federal and state consumer protection laws.

**F. Notices to Defendants Under State Law**

17.      In accordance with Virginia Code § 59.1-203(B), the Plaintiff gave Defendants written notice these proceedings were contemplated and provided them with a reasonable

opportunity to appear before the Office of the Attorney General to demonstrate that no Virginia Consumer Protection Act violations had occurred, or, in the alternative, to execute an appropriate Assurance of Voluntary Compliance.  All Defendants appeared, but none showed that no violations had occurred, and none have executed an appropriate Assurance of Voluntary Compliance.

**G.  Notice to Consumer Financial Protection Bureau under Federal Law**

18.    In accordance with 12 U.S.C. § 5552(b)(1) and 12 C.F.R. § 1082.1, the Plaintiff gave notice to the Consumer Financial Protection Bureau before commencing this action.

### III. JURISDICTION AND VENUE

**A.  Personal Jurisdiction**

19.    This Court has personal jurisdiction over each of the Defendants as follows and as detailed in the facts alleged herein.

20.    As Power Home's Chief Executive Officer, Mr. Waller conducted business in Virginia generally and the Eastern District specifically by directing and participating in the marketing and sale of solar systems to thousands of Virginians, including hundreds in the Eastern District.

21.    As the Chief Marketing Officer of Power Home, Mr. Klink conducted business in Virginia by participating in the marketing and sales of solar systems to thousands of households in the Eastern District as described below.

22.    Cross River Bank conducted business in Virginia by extending credit – loans to purchase solar systems – to over 200 Virginia households, including dozens in the Eastern District.

23.    Operating as Dividend Finance, LLC, Fifth Third conducted business in Virginia by extending loans to purchase solar systems to over 300 Virginia households, including dozens in the Eastern District.

24.     GoodLeap conducted business in Virginia by extending loans to purchase solar systems to over 1,000 Virginia households, including hundreds in the Eastern District.

25.     Mosaic conducted business in Virginia by extending or brokering loans to purchase solar systems to over 1,000 Virginia households, including dozens in the Eastern District.

26.     Sunlight Financial conducted business in Virginia by arranging or brokering solar loans to over 550 Virginia households, including dozens in the Eastern District.

27.     Technology Credit Union conducted business in Virginia by extending solar loans to over 350 Virginia households, including dozens in the Eastern District.

**B. Subject Matter Jurisdiction**

28.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims brought under the Consumer Financial Protection Act, 12 U.S.C. § 5536(a).

**C. Supplemental Jurisdiction**

29.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear actions enforcing state consumer protection laws. As described herein and in Counts I, II, III, and IV the state consumer protection claims for deceptive conduct arise out of the same facts and transactions as the federal Consumer Financial Protection Act claims and have similar legal elements.

**D. Venue**

30.     Venue is proper in the Eastern District of Virginia and the Richmond Division under 28 U.S.C. § 1391(b)(2) because, as set forth in this Complaint, including section III.A above, the Eastern District and this Division are where a substantial part of the events giving rise to the Plaintiff's claims occurred.

31.     Venue is also permissible in this the Eastern District of Virginia for the Plaintiff's claims under the Consumer Financial Protection Act, 12 U.S.C. § 5564(f), whose permissive venue

6

provision provides, "the attorney general . . . of any State may bring a civil action in the name of such state in any district court of the United States in that state."

### E.  Tolling Agreements

32.    Each Defendant has or has had a tolling agreement with the Plaintiff, under which they have agreed to toll any statute of limitation and any other time-related defenses for the claims brought in this Complaint for the tolling agreement's effective period.

33.     These tolling agreements, with extensions, have been in effect from the following dates through this Complaint's filing date:

- Cross River Bank - May 3, 2023;
- Dividend - March 28, 2023;
- GoodLeap - June 28, 2023;
- Mosaic - March 28, 2023;
- Sunlight - March 28, 2023;
- Technology Credit Union - November 22, 2022.

34.    Messrs. Klink and Waller had tolling agreements in effect from June 4, 2024 to June 4, 2025.

### IV. FACTS I OF II: DECEPTIVE ADVERTISING, MARKETING, AND SALES USED TO SELL SOLAR SYSTEMS AND LOANS

### A.  Loans Fueled Power Home's Residential Solar Sales.

35.    Messrs. Waller and Klink were childhood friends who first went into business selling residential alarm systems through telemarketing and in-home sales.

36.    But they shut down their alarm security business due to state and federal enforcement actions and a slew of private lawsuits alleging they violated telemarketing laws by calling people on the Do-Not-Call registry and disregarding requests not to be called.

37.    As the sun set on their residential alarm business, they turned to selling solar energy systems and founded Power Home in 2014.

38.    From 2014 until it filed for Chapter 7 bankruptcy in October 2022, Power Home advertised, offered for sale, sold, and installed residential solar and energy efficiency products in Virginia and other states.

39.    Specifically, it sold, installed, and repaired solar panels, solar batteries, inverters, electrical panels, and insulation, all for residential use.

40.    Power Home grew steadily, increasing sales across all states from 5,000 loan-backed residential solar systems in 2019 to over 10,000 in 2021.

41.    As sales grew, Power Home increased prices, with average prices rising from $30,000 in 2019 to over $64,000 in 2021 and 2022, even as solar equipment prices decreased market wide.

42.    As sales and prices increased, so did Power Home's need for consumer loans.

43.    As a Power Home sales trainer explained to trainees, "99% of your consumers are going to finance it because they don't have $70 grand lying around."

44.    Or, as Mr. Klink testified in 2025, "[t]his is a substantial purchase that requires use of other people's money."

45.    By 2020, the Lenders financed 95% of Power Home's sales, a rate that continued through Power Home's bankruptcy in 2022.

46.    In Virginia, Power Home and the Lenders sold over 4,700 solar systems and purchase loans for those systems, as shown in the following chart:

| Lender | Role | Years | Estimated Number of Virginia Loans |
| --- | --- | --- | --- |
| Dividend Solar Finance LLC | Funder, Servicer, Seller | 2021-2022 | 530 |
| GoodLeap | Funder, Servicer, Seller | 2018-2022 | 1,682 |
| Mosaic | Funder, Broker, Servicer, Seller | 2017-2021 | 1,332 |
| Sunlight Financial LLC | Broker, Servicer | 2019-2022 | 1,174 |

| Technology Credit Union | Funder for Loans Brokered and Serviced by Sunlight | 2019-2022 | 754 |
| Cross River Bank | Funder for Loans Brokered and Serviced by Sunlight | 2019-2022 | 296 |
| **Virginia Total** | | **2017-2022** | **4,718 Loans** |

47.     The loans during this period were long-term: over 90% were for 20- and 25-year terms.

48.     Ultimately, these Defendants extended over $225 million in solar loans to Virginians for purchases of Power Home solar systems.

49.     These loans were the product of deceptive advertising, marketing, and sales, contained hidden fees, and have harmed and continue to harm consumers in Virginia, among numerous other states.

**B. Lenders Delegated Advertising, Marketing, and Selling of their Loans to Power Home, Subject to the Lenders' Control**

50.     In return for loan funding, Power Home acquired loan consumers for the Lenders.

51.     Dividend, GoodLeap, and Mosaic had contracts – generally called "Program Agreements" – directly with Power Home.

52.     Sunlight had a different arrangement: it had Program Agreements with Power Home to arrange and broker loans funded by Cross River Bank and Technology Credit Union, each of which had their own program agreements with Sunlight.

53.     Each Program Agreement delegated advertising, marketing, promotion, and sales of the systems and loans to Power Home subject to the Lenders' control.

54.     Each Program Agreement provided the Lenders could do the following:

- Obtain, review, and audit Power Home's advertising, marketing, and sales materials (especially sales proposals described further below).
- Require advertising, marketing, and sales materials to meet lender-set standards.
- Approve and reject those materials.

9

- Train and direct sales representatives about loan applications, loan disclosures and terms, and loan agreements.
- Participate in Power Home's sales and marketing trainings.
- Obtain consumer-specific materials like electric bills.
- Review consumer complaints and complaint resolution processes and responses.
- Set standards for pricing, installation timelines, warranties, and loan disbursements.

55.   With these Program Agreements in place, lenders did not need to (and generally did not) conduct their own advertising, marketing, or sales of their solar loans to Virginia consumers; they used Power Home to do so.

56.   Consistent with these Program Agreements, in practice, the Lenders relied on Power Home to advertise, market, and sell their loans.

57.   Lenders often put this plainly: Power Home sold their loans.

58.   For example, in training materials and emails, Mosaic described the installer's role as "selling the Mosaic loan" and "selling Mosaic," and in its Program Agreement with Power Home wrote that the "Dealer sales force will be responsible for . . . promoting and facilitating access to the Home Solar Loan Product."

59.   And Sunlight encouraged salespeople to "Sell Deals" and to "sell" Sunlight loans, as shown in this screenshot from sales training materials it provided to Power Home:



60.   To sell their loans, the Lenders delegated the credit application, loan application, and loan execution process to Power Home's salespeople, subject to their control.

61.    Each Lender authorized Power Home's salespeople to

- collect consumers' credit application information;
- enter or help consumers enter their credit applications into salespeople's' tablets;
- receive notice that lenders had approved a consumers' credit application;
- explain loan terms, including prices, rates, fees, term, amortization, and disclosures;
- explain and review loan agreements; and
- have consumers sign the loan agreements in the salespeople's presence.

62.    For example, Mosaic asked installers to "walk the consumer through the process" of credit applications and checks, to "explain key loan terms," and to "Review the Loan Application and Truth in Lending Act (TILA) disclosure statement with the consumer," while providing a Do-and-Don't list about how to do that.

63.    Conversely, Lenders avoided having their employees talk to consumers until after the consumers signed the loan agreements.

64.    These policies were intended to allow Power Home to "close more sales," as Sunlight phrased it.

65.    GoodLeap avoided making its "welcome call" to consumers until after the contract was signed and the consumer's statutory right-to-cancel period had expired.

66.    Yet those calls were, in GoodLeap's words "to assure the consumer is clear on the terms of the loan, to answer any outstanding questions, and address any concerns with the solar company's performance or otherwise the consumer may have."

67.    Dividend touted to Power Home in an October 2020 presentation and in a May 2021 deal proposal that it generally would conduct "no welcome call," meaning it would not call consumers before its loan contracts were signed.

11

68.     A February 2021 Dividend pitch deck to Power Home touted that Dividend had a policy of conducting "Welcome Calls" on less than "2% of all deals," just for elderly borrowers and "jumbo loans" of more than $130,000.

69.     Dividend also recommended that when welcome calls did occur, Power Home salespeople should be present in the home during the call.

70.     Mosaic also had a policy to conduct "Welcome Calls" only after consumers signed loan agreements.

71.     Mosaic allowed Power Home to require its salespeople to be present in the home with the consumer during those calls.

72.     After an initial period, Sunlight told Power Home in April 2020 that it would make "no confirmation calls," and its training materials noted that this would make for an "Easy Sales Process" and help Power Home make or "close" more sales "in the home."

73.     Cross River Bank and Technology Credit Union made no calls to consumers before loans were executed and the cancellation period had passed.

74.     Altogether, Lenders' policy of avoiding talking to consumers pre-sale permitted Power Home to deceptively pitch its systems and their loans.

## C.  The Core Deception: A Loan-Funded Solar System Saves You Money

75.     The marketing and sale of solar loans and systems relied on a core deception: loan-backed solar purchases would save the consumers money compared to their current power bill.

76.     A quintessential example of this appeared in emails Power Home sent from 2017 through 2019 to consumers who tried to cancel loan and purchase agreements.

77.    These emails told consumers Power Home will "make sure you are saving money from day one.  YES YOU ACTUALLY PUT MONEY IN YOUR POCKET . . . every year.  This actually will replace your current power bill!"

78.    The emails then showed a graphic showing that the "Old Utility Bill" would be replaced by a smaller "new utility bill" with a "solar payment" that would "SAVE" (in giant font).

79.    So the email claimed consumers (i) would save money from day one; (ii) would save money every year; and (iii) "will replace" their current power bill with lower bills, including their loan bill or "solar payment."

80.    Mr. Waller drafted this email content, directed employees to use it, and was copied on thousands of such emails.

81.    Similarly, sales brochures used in all sales from 2016 through at least 2020 had the same three messages: they claimed

- consumers could "sit back and enjoy the savings";
- consumers would "start saving from Day One with no money out of pocket"; and
- "[y]our new, dramatically lower utility bill plus your solar payments will be less than your old electric bill and saving [*sic.*] will accumulate quickly over the years."

82.    Messrs. Waller and Klink received, reviewed, and approved the use of sales brochures with this content.

83.    Salespeople were trained to reinforce this content.

84.    In a spring 2017 sales training, Power Home trained salespeople to tell consumers they could expect a "cheaper electric bill from the start" and "Power Home exists so we can provide people with an alternative for a locked in rate and cheaper from the start."

85. These three messages – savings from day one, savings every year, replacing the current bill with a lower bill – recurred through the advertising, marketing, and sales of Power Home's systems and the Lenders' loans described below.

86. These messages were deceptive.

**D. The Reality: Few Customers Would Save or Did Save Money from Day One – They Would Lose Money Initially and for Years to Come**

87. The reality differed from the messaging: consumers could not, would not, and were not saving money from day one, saving money every year, putting money in their pockets, or replacing their current bill with lower bills.

88. Messrs. Waller and Klink were repeatedly told by potential investors, investment advisors, lenders, and their own data, that at its prices, the economics for purchasers were poor, with consumers needing a decade or more to start seeing any positive return or savings.

89. For example, on February 2, 2018, investment advisors wrote to Messrs. Waller and Klink and told them that while they are telling investors and consumers there are "average savings of approximately 20% for the consumer in Year 1," in fact, "In the many example proposals we have received for the dataroom, however, it seems that a consumer typically receives little to no savings immediately."

90. Mr. Klink confirmed he knew this, stating under oath, "A lot of people did not save in their first year."

91. Lenders also knew or should have known this.

92. For example, GoodLeap ran its own "savings calculator" on four randomly selected Power Home / GoodLeap loan consumers in 2022, and found even if their systems worked

14

perfectly, each consumer would not only lose money initially, but they would also lose money for every year of a 20- or 25-year loan term.

93.     This meant that each month (on average) the consumer would pay more than if they had never bought solar.  And this would continue for 240 months or more; there would be no "savings" and no "money in your pocket."

94.     GoodLeap conveyed these audit results to Messrs. Waller and Klink and other Power Home directors, telling them it was concerned about misrepresentations and misleading information, because consumers were "actually paying more . . . than prior to going solar."

95.     But GoodLeap never told consumers this information.

96.     GoodLeap is not alone – each defendant here had multiple ways they knew consumers faced or had money losing purchases.

**E.  Prices and Loan Amounts Were Too High for Consumers to Save Money**

97.     Defendants – bankers, lenders, or businesspeople – knew these were money-losing purchases because their prices for these systems and loans were far higher than normal.

98.     The solar industry gauges prices by a solar system's price per watt.

99.     Power Home's prices per watt were "incredibly high," in the words of Dividend's managers when conducting due diligence in 2021.

100.    For example, according to a 2022 GoodLeap analysis, Power Home's average price per watt was $8.17 compared to $4.81 for all other solar providers, 70% higher than average.

101.    Each Lender knew or should have known Power Home's prices were higher than other installers.

102.    They knew Power Home's prices were high because each capped installers' maximum prices per watt and monitored those prices.

15

103.    They each permitted Power Home to sell at prices at or near their maximum limits.

104.    Several even raised those maximum price limits, sometimes repeatedly.

105.    For instance, to solicit Power Home's business in May to June 2021, Dividend's managers discussed whether to allow Power Home to "go around" Dividend's industry-wide $6 per watt price limit. They decided to allow Power Home to "operate above" that limit, so long as it sold batteries with the solar system and loan.

106.    In a June 2021 Zoom meeting, Dividend's managers told Power Home's sales managers that, "We've essentially eliminated a lot of the standard rail guards we sometimes put in place as far as [price] caps and things of the nature, so Power Home is pretty much going to have free rein in that regard."

107.    Dividend eliminated its "standard rail guards," because it wanted Power Home's loan-generating business.

108.    Likewise, in June 2020, Sunlight and Technology Credit Union approved Power Home's request to raise their usual price limit, despite their concerns about the impact on consumers.

109.    Higher prices led to larger loan amounts.

110.    Sunlight and Technology Credit Union determined in 2021 their average loan for Power Home consumers ($58,395) was 47% higher than for other installers ($39,765).

111.    GoodLeap determined in May 2022 its average loan for Power Home consumers ($52,688) was 42% higher than for other installers ($37,150).

112.    Higher loan amounts increased consumer loan default risks by increasing monthly and total payments.

113.    In turn, higher loan amounts meant consumers would and did lose money because their loan payments would exceed their solar production and energy savings.

## F.  Battery Sales Drove Prices and Loan Amounts Higher

114.    Battery sales drove prices and loan amounts higher.

115.    Residential solar systems do not require batteries to operate; they are optional.

116.    In January 2020, at Messrs. Waller's and Klink's direction, Power Home began selling solar batteries priced at $20,000.

117.    By 2021, it required batteries in every sale.

118.    In April 2022, Waller wrote that, "Our battery attachment rate in 2021 was nearly 95 percent which is triple the rate of our competitors," and cited this as an example of his expertise, decision making, and vision.

119.    Defendants knew that expensive batteries would mean, in Mr. Klink's words, "less financial savings" for consumers.

120.    Expensive batteries were even less necessary for households with reliable power, with existing generators, with utilities that allowed the sale of excess electricity back to the power grid, or with no place to properly install batteries – yet, after 2020, Power Home sold them to almost everyone.

121.    Lenders facilitated battery sales.

122.    By early 2020, Mosaic, GoodLeap, Sunlight, Cross River Bank, and Technology Credit Union had all agreed to fund Power Home's battery sales and each created new 25-year loan agreements to do so at Power Home's request.

123.    Likewise, Dividend, which started lending to Power Home consumers in 2021, issued only 25-year loans for solar plus battery sales.

124.    Ultimately, Lenders made over $500 million in 25-year consumer loans for solar systems with batteries.

125.    The Lenders knew batteries drove consumer loan amounts higher.

126.    For example, an August 2021 analysis by Sunlight and Technology Credit Union stated, "Power Home has a battery attachment rate of ~90% and sells a home efficiency package with every deal, which drives the loan cost higher ($20K Generac battery)."

127.    All Defendants knew or should have known selling batteries with every solar sale was not an industry practice.

128.    For example, the same August 2021 Sunlight and Technology Credit Union analysis found, "Power Home Solar has a 91% battery attachment rate for funded loans, compared to only 5% [for] other installers."

129.    And a December 2021 Power Home report prepared at Klink's direction touted its greater than 95% battery sales rate compared to leading competitors' 24% and 30% rate.

## G. Hidden Loan Fees Drove Prices Higher

130.    Hidden loan fees drove solar system prices and loan amounts even higher as described in section V below.

## H. Savings and Value Were Material to Customers

131.    Defendants knew or should have known consumers cared about saving money on solar purchases or loans.

132.    As Sunlight characterized it in this 2021 investor presentation, consumers want "to save money by going solar."

133.    Power Home's Vice President for Sales testified the consumer wants to see the "meat and potatoes, if you will, like that's what the consumer wants to see is, 'Hey, how much does this cost, how much can I save, what does solar look like for my home.'"

134.    Power Home's consumer surveys found "cost savings" as a "very important" or "important" factor when deciding to buy solar. The surveys concluded that "78% of end users were primarily motivated to adopt solar due to the economic value proposition of solar power."

135.    Power Home's sales training materials emphasized to salespeople, "at the end of the day, this is a financial decision for the client. We know that the person who is reaching out to us is budget conscious. You must keep this in your focus, everything is about financial return."

136.    In a September 2017 email, Mosaic admonished Power Home for "high priced jobs" that "come in well above market average," explaining, "Customers are less likely to pay their solar bill if they do not feel like they are seeing value, savings, or what they signed up for. Customers with higher solar bills than historical utility bills are a higher risk."

137.    Likewise, on information and belief, GoodLeap's sales training materials made the same point: consumers are focused on financial return.

138.    Similarly, Sunlight and Technology, when evaluating Power Home's price increase requests, recognized that higher prices affected whether consumers "have" or "make" "savings" and affect consumers' "value proposition."

139.    So, with high prices, overpriced batteries, and substantial lending fees, Power Home and the Lenders had a challenge: selling expensive loans and solar systems to value-conscious consumers.

140.    They overcame this challenge by misrepresenting the value, costs, benefits, financial return, and risks of solar purchases and solar loans in the advertising, marketing, and sales materials described below.

## I.  Advertising Emphasized Savings and No Costs to Consumers While Omitting Actual Loan Costs and Terms

141.    Power Home's investor presentations described advertising as a "digital marketing and sales engine" whose purpose was "to drive consumer acquisition" for both Power Home and the Lenders.

142.    By January 2021, 1.4 million consumers a year saw and responded to advertisements like the ones described here and moved to the next stages of the "sales engine."

143.    Advertisements claimed <u>savings</u>, including these social media advertising claims:

- "start saving money on your very first electric bill,"
- "may save thousands on their electric bills,"
- "could save money on their electric bills,"
- "[c]ould Save Money in 2021 By Going Solar for $0 Down."
- "Reduce your electric bill & save THOUSANDS!"
- "Save THOUSANDS with reduced energy costs,"
- "Solar allows you to OWN your power and reduce your energy bill helping you save thousands with reduced energy costs."

144.    Advertisements also claimed solar had <u>minimal costs</u>: consumers could "get" or "go" solar with "$0 Down," "$0 out of pocket," "$0 at install," "nothing out of pocket at install," "nothing out of pocket to get started," "nothing out of pocket," or "without using their own money."

145.    Advertisements also claimed consumers could "<u>get paid</u>" cashback, "get $2,000 Cash Back," get "$2,000 cash," get "covered for 12 months," "get cash in your pocket," or "We'll Pay You to Go Solar."

20

146.    For example, the social media ad below claimed savings, minimal cost, and cash back claims: "We'll pay you $2,000 and install solar & battery for $0 out of pocket.  Get paid to save money on your electric bill.  Click below to see how much you can save . . . ."



147.    Similarly, the social media ads below claimed Virginia consumers could "know you have less bills to worry about and more money going into your pocket" or could "go solar without using their own money, while saving thousands at the same time."





148.    The social media advertisement below featured Mr. Waller next to a pile of money showing electric bill savings while claiming "$0 Down" and "Save Thousands on Your Electric Bill With Solar."



149.    A 60 second YouTube advertising video posted in December 2019 featured Mr. Waller claiming, "You ready to own your power? We install solar in your home for $0 down, not one single penny."

150.    Likewise as shown in screenshots below, a television commercial featuring Mr. Waller claimed, "Are you tired of rising power bills? Let me give you the winning game plan for beating those high energy costs. Go solar with Power Home Solar today. Most people think solar

costs thousands - well, I'm throwing a flag on that!" Meanwhile, on the screen it said "Solar Costs Thousands? Wrong!"



151.    Likewise, search engine advertisements claimed, as shown below, "No Initial Cost Solar," "No Cost at Install & Get 12 Months on Us," "Get Paid Over $2K | After Install," "Go Solar for $0 Down + Get Over $2,039 Cash Back After Install."



152.    Advertisements generally did not indicate that solar purchases actually cost thousands of dollars, involved loans, or risked losses.

153.    A few advertisements hinted that consumers would need to take out a loan, but this hint appeared only in disclaimers written in miniscule font, unreadable to ordinary readers on

typical devices.   For example, the red arrow added to the advertisement below points to the

unreadable sentence: "You are still responsible for paying a monthly loan to your lender."



154.    The advertisements could have – but did not – legibly disclosed the solar systems' prices or price ranges, that loans were used, that loans could take years to pay off, that consumers could lose money, or that loans could affect home value or resale.

## J.  Website and Landing Pages Emphasized Savings and No Cost to the Consumer

155.    Responding to online advertisements routed consumers to Power Home's webpages, a fillable form, or a "landing page."

156.    These forms and pages emphasized savings and the lack of cost to the consumer.

157.    In the January 2019 example below, a Facebook fillable form touted a "$0 Out of Pocket" program that would "[s]ave money on your electric bill" in contrast with average solar installation costs: "[i]nstalling solar panels can cost the average [state] homeowner $25,000 or more, making it too expensive for most people to go solar."  This implied a Power Home purchase was less expensive than $25,000, which was not true.



158.    A 2021 landing page made similar "no cost" claims, stating, "Take our <u>30-Second</u>

<u>Solar Survey</u> to See if You Qualify for USA Made Solar Panels + Generac Battery for **NO COST**

At Install PLUS Get Paid Over $2,039 Bonus After Install."

159.    The website page likewise claimed:

- "Get an Entire Year of Solar on Us!"
- "Get a GENERAC Battery & Solar System for $0 Down."
- "We'll cover your first year's payment."

160.    The landing, form fill, and website pages did not disclose actual costs, loans, or that

consumers would be taking on debt or risk of losses.

161.    Thousands of Virginians saw the website or used form fill and landing pages.

**K.  Advertising Falsely Implied Consumers Qualified for a Federal Tax Credit**

162.    Power Home's advertisements often included a claim that consumers could "Click

below to determine if your home qualifies" for a federal tax credit.

163.    Here are examples of such advertisements claiming, "homeowners who qualify may receive a 26% tax credit" and "click" to qualify:





164.    Below is a similar advertisement featuring Mr. Waller, claiming, "TAX CREDIT

AVAILABLE – Qualified homeowners may also save thousands after install with the 26% Federal

Tax Credit":



165.    Clicking the advertisement took the consumer to a page where they went through a

qualification process.

166.    But the qualification process was not for the tax credit; instead, it just checked if the consumer met Power Home's own sales criteria, not the actual criteria for receiving the advertised "26% Federal Tax Credit."

167.    So the qualification process misled consumers about their eligibility for and likelihood of receiving the tax credit.

## L.  Lenders Authorized Joint Advertising

168.    The Lenders authorized Power Home to advertise on their behalf to generate consumers or "leads."

169.    Dividend's Instructions and Procedures for Power Home described how "marketers" would solicit, market, or initiate leads for its loan agreements.

170.    GoodLeap specifically cited creating additional "lead generation" sources as one of its joint goals with Power Home in internal documents.

171.    Mosaic's Dealer Agreement with Power Home specifically described a "Lead Generation Program" and referring leads to Power Home's call center.

172.    Mosaic repeatedly emailed and met with Power Home to discuss "collaborative marketing and lead generation opportunity" and "lead gen / marketing initiatives" as part of a "roadmap of strategic items to support growth" for Mosaic and Power Home.

173.    Sunlight's Program Agreement with Power Home specifically delegated Power Home authority to conduct lead generation.

174.    Cross River Bank and Technology Credit Union possessed Sunlight's program agreement with Power Home and their own agreements with Sunlight authorized Sunlight to prepare, review, and approve advertising materials used by Power Home.

**M. Messrs. Waller and Klink Directed and Actively Participated in Advertising**

175.    From 2016 to 2022, Mr. Klink oversaw advertising and lead generators while also negotiating and signing contracts with them, providing and reviewing advertising content and placement, tracking and reviewing their performance, and incentivizing them with performance-based payments.

176.    Mr. Waller supervised Mr. Klink's advertising responsibilities, including approving expenditures, reviewing content and placement, reviewing advertising metrics, and appearing personally in advertising across different media.

177.    For example, from 2020 through 2022, both Messrs. Waller and Klink were copied on all advertising approval emails, received all advertising content used in every medium described in this Complaint, and periodically commented on, approved, and revised advertising content.

178.    Mr. Klink testified that Mr. Waller appeared in advertising from 2019 forward "because we needed a face to the company and no better than the CEO [*sic.*]"

**N. The Call Center "Nurtured" and Pitched Clients Brought in By Advertising, Telling them Solar Was a "Win-Win" with "$0 Down."**

179.    The call center's job was to convert advertising leads into sales appointments.

180.    With advertising generating interest from hundreds of thousands of consumers, the call center was a key part of the marketing operation.

181.    Power Home measured and graded call center employees on their "conversion percentage," how successful they were in persuading consumers who saw advertising to agree to sales meetings.

182.    Mr. Klink, in his role as Power Home's Chief Marketing Officer, oversaw and managed call centers including approving call center scripts.

183.    The call center employees used scripts.

184.    The scripts claimed solar system purchases would cost consumers less than their current bills.

185.    For example, from at least 2020 through October 2022, call center employees were trained to tell consumers that any money that they might spend on solar was money that they would have spent on utility bills: "So that's the thing… with our zero down program you don't have to pay anything out of pocket… and the best part is the monthly solar payment… you're already paying for it… (who is your power company again?) …so instead of paying them that payment, you'll pay a solar payment and you'll end up saving thousands over time."

186.    From at least 2020 to 2021, scripts trained and instructed call center employees to emphasize cost savings by saying the following:

- "So just out of curiosity, what got you interested in solar, was it like most, you heard about our $0 down program and wanted to see how much money you can save? Great! I can't wait for you to see how much you're going to save!"

- "It's a zero-down program, no surprises, I promise! It's literally a no brainer"

- To ask for utility bill information "so we can show you exactly what your cost-savings will be"

- "Now is that your gas and electric bill combined, or just your electric? Wow . . . you should definitely save some money there!" [underline in original]

- "But I promise, no, I GUARANTEE you're gonna be super impressed with everything after they show you how you'll save thousands.  Let's just get them out to show you everything and if it doesn't make sense, no harm done.  At least you'll have the information and you'll know what you can save by going solar."

187.    Likewise, from April 2021 through October 2022, scripts trained and instructed call center employees to emphasize cost savings and tell consumers solar was a "WIN-WIN."

188.    Together, these scripts repeatedly mentioned saving money with definitive language like "exactly," "promise," "definitely," "no brainer," "Win-Win," and "guarantee."

32

189.    Conversely, from January 1, 2017 through October 2022, Power Home discouraged call center employees from disclosing, discussing, or mentioning that solar systems cost money, the amount they cost, that purchases generally involved loans, or any of the terms of the loans.

190.    Their sales trainers and written training materials told them, "You don't ever have to talk about numbers, specifics, or details. That is exactly what we are getting them set up for."

191.    If consumers hesitated or expressed doubt, call center employees were trained to use talking points called "Rebuttals."

192.    Rebuttals included the following talking points:

- "Listen, if someone told me that I could save thousands on a bill that never goes away just by letting someone come out to give me a price, I'd do it in a heartbeat. It would be crazy not to - total no brainer."
- "This is the one time where buying something will SAVE you money and lower your bills instead of costing you more. It's a no brainer."

193.    These rebuttal talking points emphasized that solar purchases were a "no brainer," because its costs would be less than current bills – buying it would "SAVE you money and lower your bills instead."

194.    Savings claims continued as the call center asked probing questions.  For instance, when asking the consumer what their average utility bill is each month, call center staff were trained to restate that amount and say "Per month?! Now is that your gas and electric bill combined, or just your electric? Wow! We should be able to help you."

195.    Call center scripts also told consumers about a federal tax credit.

196.    From at least April 2021 through October 2022, their scripts said the following or something similar: "So right now there's a large federal tax credit that may be available for going solar if you are eligible — it is impacted by your income, would you say your combined household income is at least $40k or higher? <Wait for Lead Response> Got it!"

197.    This tax credit script implied that consumers with a combined income of more than $40,000 would receive the federal tax credit if they purchased solar.

198.    Call center scripts were read to tens of thousands of potential Virginia purchasers and thousands of actual purchasers.

## O.  The Lenders Knew Power Home Used Its Call Center to Pitch Customers

199.    The Lenders knew, or should have known, Power Home was using call centers as part of the sales process.

200.    For example, Mosaic's program agreement with Power Home specifically discusses call centers and telemarketing.

201.    For another example, Sunlight pitched Power Home on a "preapproval process" it was offering with Cross River Bank that could lower costs and help with the "outbound telemarketing" and "appointment setters" that Power Home was conducting.

## P.  Between the Call and the Sales Meeting, Texts Emphasized Savings

202.    After the call center scheduled meetings, Power Home sent consumers text messages.

203.    As shown below, these messages discussed "helping you save thousands," "how much you might be able to save," and claimed a "solar expert" (actually just a salesperson) would make a "personalized savings assessment."



204. These text messages indicated that the loan-backed solar purchases would produce savings; conversely, they gave no indication of the actual price, cost, value, or risk to consumers.

**Q. In Home Sales Pitch's Purpose Was to Sell Solar Systems and Loans in One Sitting**

205. Lead generation advertising, call center pitches, and written communications funneled consumers to the sales pitch for solar system and loans.

206. From 2017 through 2022, sales pitches were largely in person at consumers' homes.

207.    Power Home carefully scripted its sales pitch, including creating and using training videos showing salespeople the model or "perfect" pitch.

208.    Each Lender had the power and authority under their program agreements to obtain sales pitch materials, including proposals, training materials, and recordings.

209.    Dividend, GoodLeap, Mosaic, and Sunlight each conducted sales trainings for Power Home staff on how to sell the loans they arranged, funded, or brokered.

210.    Power Home, with the Lenders' authorization and knowledge, promoted a "one sit close" or "one visit close."

211.    A "one sit close" is structured so that the consumer does not have additional time to consider a sales pitch or to compare it to other solar products or loans – the goal is to have the consumer agree to the purchase and execute contract documents that day.

212.    For example, a November 2018 Sunlight sales training for Power Home touted how Sunlight would help with the "Easy Sales Process" by providing "same day notice to proceed," which helped "empower" salespeople to "sell with confidence."

## R.  Digital Proposals Helped Power Home Pitch Their Systems and Lenders' Loans Together

213.    To achieve a "one sit close," Power Home and the Lenders relied on digital sales proposals, which were used at sales visit from 2017 through 2022.

214.    The sales proposals designed a consumer's solar system, priced it, selected a specific lender, provided specific loan terms from that lender, pitched the system and the loan, incorporated Lenders' credit and loan applications, and helped transmit purchase and loan agreements.

215.    The proposals were the centerpiece of the sales presentation as shown in this screenshot from a role-played training video, with the proposal (on a tablet) in front of the consumer.



216.    In training materials, Power Home described the proposal's purpose as helping the salesperson "close your deals quickly" and to "convey the value of solar."

217.    Director of Sales Ben Brookhart testified: "The proposal is really the meat and potatoes, if you will, like that's what the consumer wants to see is, 'Hey, how much does this cost, how much can I save, what does solar look like for my home.'"

218.    Power Home knew consumers relied on its proposals.

219.    It claimed to potential investors that its digital sales proposals "lead to superior close rates," (the percentage of sales meetings resulting in a sale) and "increase" and "drive" "consumer confidence in solar and energy storage."

220.    It specifically connected the sales pitch's presentation of "potential savings" as a cause of its "superior close rates."

37

221.    Messrs. Waller and Klink reviewed, commented on, and actively participated in the formulation and approval of the sales proposals and sales presentations.

## S. The Lenders Knew Power Home Used Sales Proposals to Sell their Loans, Required Power Home to Provide them, and Most Obtained and Reviewed Them

222.    Lenders all knew sales proposals were used to sell their loans.

223.    Lenders knew or should have known the proposals' content because each had authority to obtain, review, and approve them, and because most did acquire and review those proposals.

224.    Dividend required Power Home to provide it with each consumer's "Initial Proposals," which it described as the "preliminary proposal for financing," and as the "relevant marketing material" that preceded signing loan agreements.

225.    Dividend obtained and reviewed the digital proposals Power Home used.

226.    Dividend also obtained and reviewed training videos and manuals showing exactly how Power Home presented proposals to consumers and those proposals' contents.

227.    And Dividend integrated its lending platform into Power Home's sales proposals, to allow and help Power Home's salespeople to sell consumers Dividend loans.

228.    GoodLeap required Power Home to provide it with its sales proposals, regularly obtained and audited those proposals, and integrated its lending platform into those proposals, to allow and help Power Home's salespeople to sell GoodLeap loans.

229.    Mosaic also required Power Home to provide it with sales proposals, and, in practice, asked for, obtained, and reviewed those proposals, and integrated its lending platform into those proposals to allow and help Power Home's salespeople to sell Mosaic loans.

230.    Sunlight, Cross River Bank, and Technology Credit Union each knew Power Home used proposals to promote their "financing" and "loans" because their program agreements expressly described "Advertising Materials" as the "installation proposals used by Dealers to promote the sale of Systems and Improvements and financing therefor, including Loans under the Program."

231.    Sunlight's Underwriting Guidelines also specified that it would obtain proposals, approve them, approve any changes to them, and provide them to Cross River Bank and Technology Credit Union on request.

232.    Likewise, Sunlight's "Solar Installer Checklist" and its due diligence report on Power Home, provided to Technology Credit Union, required it to obtain the "Sample Financing Proposal."

233.    Sunlight, did, in fact, obtain and review Power Home's digital proposals, beginning in April 2018 and continuing into the proposals used from April 2021 to October 2022.

234.    Sunlight even reviewed, commented on, and edited specific pages and content of the sales proposals.

235.    Sunlight also integrated its lending platform into the proposals to allow and help Power Home's salespeople to sell loans Sunlight brokered or arranged and Cross River Bank and Technology Credit Union funded.

**T.  Proposals Built "the Pain" from Current Utility Bills**

236.    The sales proposal's overall pitch was that consumers would reallocate the money they would have spent on utility bills into a solar system and loan, reinforcing the advertising and call center message.

237.    The first step was to secure 12 months' worth of utility data from consumers to determine the consumer's energy usage and spending and to incorporate that into the sales pitch.

238.    For instance, an April 2021 sales checklist required salespeople to obtain 12 months' utility data: the checklist said, "12 Month Usage (Must Have!!)."

239.    Most consumers could and did provide utility bill data; if they didn't Power Home would create an "assumed usage" and use those numbers.

240.    Power Home then trained salespeople to scrutinize the bills, focusing on utility consumption and spending, a tactic termed "build the pain" or "feel the pain."

241.    For example, a 2018 Power Home sales training video and manual trained salespeople to ask probing questions about utility bills while standing by the utility meter to start to "build the pain of paying for power."

242.    One purpose of building the pain was to claim that solar costs would be paid from money they would otherwise spend on utility bills.

243.    The Lenders knew or should have known about this tactic.

244.    Mosaic knew about it: its Program Agreement with Power Home required Power Home to provide at Mosaic's request the "Last 12 months of Energy Bills," that Power Home used for its "Avoided Cost Analysis."

245.    GoodLeap knew about it: it even trained installers on a "1-2-3 Closing Technique" whose first step was to do exactly what Power Home did: "Recap Current Bill Review (Energy Discussion)," which it described as a "critical part of the sales process that reinforces the **problem** you are about to solve for the homeowner."

246.    GoodLeap knew its purpose: to tell consumers the loan-backed solar purchase would come from money the consumer would have spent anyway.    It recommended the

40

salespeople should, "Get the consumer to agree that their utility bill is unavoidable and they have to pay it monthly ANYWAY," by saying, "Mr./Ms. consumer, it looks like you're paying about $140 a month on average, does that sound right? Up until recently, you didn't have a choice on how you buy power. This is an unavoidable bill, that we all have to pay every single month ANYWAY, no matter what, do you agree?"

247.    While reviewing the pain of current utility bills, salespeople were to input utility bill data into the proposal with the consumer's participation, emphasizing how high those bills were.

248.    The proposal software then displayed and tallied the current utility costs and consumption visually, either as a bar graph, a line graph, or both.

## U.  Proposals Inflated the "Pain" Using Knowingly Inaccurate Utility Bill Escalators

249.    After focusing on the "pain" from current utility bills, the sales presentations and proposals extrapolated those bills into the future.

250.    These future cost extrapolations relied on an "annual utility price escalator," a percentage estimate of how much utility prices would increase each year.

251.    Across the solar industry, and as recognized by Power Home and the Lenders, "annual utility price escalators" rely on <u>actual existing data about past rate</u> changes in residential utility costs to extrapolate future rate changes.

252.    This data generally comes from the U.S. Department of Energy's Energy Information Administration.

253.    From 2017 until early 2021, Power Home used a "annual utility price escalator" that knowingly used inaccurate <u>actual past utility data</u> to overinflate future utility costs.

254.    This deception helped sell solar systems and loans in three ways: it overestimated the future cost (the "pain") of utility bills; it misrepresented the future utility bill "savings" from solar purchases; and it misrepresented loan costs over time when those costs were compared to inflated utility bill "savings."

**1. From 2017 to 2018, a 6.5% Escalator Misrepresented Solar's "Savings."**

255.    From around September 2017 through February 21, 2018, a 6.5% utility escalator rate was used to sell Power Home systems and Mosaic loans to 251 Virginia consumers.

256.    The 6.5% escalator misrepresented the actual past residential utility data for Virginia – in reality, Virginia's residential utility rates had had escalated 1.6% over 3 years, 1.4% over 5, 3.1% over 10, and 2.7% over 15.

257.    The sales proposals used the 6.5% escalator to offset loan costs with exaggerated "Solar Savings."

258.    For example, in this illustration from a January 2018 proposal to a Cumberland, Virginia purchaser who took out a 20-year Mosaic purchase loan, the oversized $63,112 in "Solar Savings" visually and numerically outweighs the actual $25,054 loan. The "Solar Savings," relied on escalating utility costs by 6.5% for 25 years.



259.    Had the proposal shown above just used an escalator based on actual Virginia utility data, the "Solar Savings" over 25 years would have shrank by more than $30-40,000.

260.    These inflated savings were used to persuade consumers that loan-backed solar systems had substantial value.

261.    Messrs. Waller and Klink were repeatedly told the escalators (and the results they produced) were wrong.

262.    During this period, in August 2017, Sunlight – which had not yet started making Virginia loans – told Power Home (including Messrs. Waller and Klink) its escalators were "not supported by specific data," writing, "Only Michigan and Massachusetts have shown greater than 5% escalators when you look at 10-year time horizons. National rate for 10 years is 3.5%.  We're really concerned that using something not supported by specific data would allow for consumers to challenge the basis on which they were sold and void a loan agreement if courts determined that the escalator was unreasonable."

263.    And in January and February 2018, Power Home's investment advisors repeatedly flagged the 6.5% utility escalator as inaccurate and not supported by historical price data, telling Messrs. Klink and Waller that investors "will question the 6.5% assumption used in all states for future residential price increases . . . . We have performed a 4-year historical analysis of residential electric rates in NC, SC, VA, MI and OH (see attached), and the average historical price increases for the entire states do not support these levels."

264.    The investment advisors sent actual historical data for 3-, 5-, 10- and 15-years in the states where Power Home sold systems and loans.  This data showed whatever time horizon one used, Virginia's utility rate increases had always been well below the 6.5% Power Home was assuming, averaging 1.6% over 3 years, 1.4% over 5, 3.1% over 10, and 2.7% over 15.

## 2. A 5.5% Escalator Intentionally Exaggerated Solar's "Savings" from Solar from 2018 to 2019

265.    Pressured by the investment advisors, on February 14, 2018, Messrs. Waller, Klink, and others agreed to use a 5.5% escalator going forward, knowing that that figure was also wrong.

266.    They did so because a 5%+ escalator still served their purpose of inflating long-term savings – for example, after Mr. Klink reviewed a comparison of a 5% escalator to a 6.5% one over 25 years, he wrote, "It's not too far off the 6.5%. Looks good."

267.    A 5.5% utility escalator was used from mid-February 2018 until mid-January 2019 to sell Power Home systems and loans funded by Mosaic and GoodLeap.

268.    The sales proposals and presentations Power Home used during this time to sell loans and systems repeatedly emphasized and relied upon these inaccurate utility rates.

269.    The proposal's second page had this graphic.



270.    The graphic and the text were both false and misleading – residential utility prices had not "steadily increased," nor "nearly doubled," nor increased at the rates shown in the graph, something that Power Home was told by its investment advisors in February 2018.

271.    Next, the proposal had six places it used inflated 5.5% utility escalators to calculate the "Cost of Doing Nothing" or to calculate average or total "savings."

272.    The third page had a "25 YEAR SAVINGS" number, calculated to the last dollar, as with the $21,459 savings number shown below.




273.    The fourth page compared the "Current Average" <u>monthly</u> bill to an inflated monthly "Average Bill in 25 Years."  With a 5.5% escalator applied 25 times, these bills appeared to more than triple, as in this example showing a $486 current average bill becoming a "$1,756 Average Bill in 25 years."



274.    It also compared the <u>yearly</u> bills, so a "Current Annual Utility Bill" more than tripled to an inflated "Annual Utility Bill in 25 years."



275.    Then it compared the <u>total</u> bills, inflating and comparing the total 25-year cost of "Stay with Utility Company" versus a "Switch to Solar":



276.    Finally, this page repeated and reemphasized the 25-year total "Cost of Doing Nothing":



277.    The next page had another prominent "25 Year Savings" amount, comparing the "cost of solar" (which included the loan cost) to the escalated "25 Years of Utility Savings" plus a calculation for "Instant Equity from Going Solar."



278.    Each escalated number was used to exaggerate the costs from not purchasing solar and to inflate solar's savings, all to misrepresent the actual costs and risks consumers faced.

279.    GoodLeap and Mosaic both knew the sales pitch for their loans and the solar systems relied on escalators or what Mosaic called "rising utility rates."

280.    In October 2017, Mosaic's East Coast Director of Sales, cited this purpose in a draft blog post that described Waller and Klink's approach for Power Home as follows: "They saw that solar now allowed homeowners to save money compared to rising utility rates, while simultaneously creating a better world for future generations by participating in the transition to clean, renewable energy." [Underline added.]

281.    GoodLeap knew how the escalators were used, and it also knew they were incorrect.

282.    Specifically, it received and audited sales proposals over the entire period it funded Power Home loans, from early 2018 through Power Home's bankruptcy in October 2022.

283.    In audits in September 2018, November 2018, December 2018, and January 2019, its auditors found that sales proposals were using what they called an "extremely high" escalator of 5.5% rather than using real world state- and utility-specific data.

284.    In September 2018, GoodLeap's lead contact with Power Home followed up on the audit, writing: "It looks like there is a 5.5% utility escalator you use in your proposals.  That's extremely high.  How is PowerHome coming to the conclusion that 5.5% is an appropriate escalator?"  And it wrote, "Are you using information from the EIA [Energy Information Administration]. . . .  The residential market is increasing roughly 2.9% annually."

285.    A month later, on October 3, 2018, GoodLeap again wrote, "Utility escalators are a big selling point, so we want to make sure the source is credible.  Where are you getting this information from?"

49

286.    "A big selling point," is a way of saying that utility escalators were material: GoodLeap knew from reviewing Power Home's proposals and other installers' proposals that escalators inflated the "cost of doing nothing" and "savings" estimates on which consumers relied.

287.    After multiple requests, GoodLeap realized that Power Home's only justification of its 5.5% escalator was a table showing increases from the "Utilities with the Highest Growth Rates in Annual Prices."

288.    In November and December 2018, GoodLeap reviewed this data and flagged Power Home's cherry-picking: it was "using data from utilities that only service 33.7% of the population in those 5 states," (those with the "highest growth rates") rather than "the combined escalator rate for utilities you do business with," which "is roughly 1.5%."

289.    Power Home knew its "Utilities with the Highest Growth Rate" data was cherrypicked: it had already been told this in February 2018 by its investment advisors.

290.    This approach yielded some absurd results. For instance, for Virginia, Power Home's cherrypicked utility growth rate data relied on increases from small utilities serving small towns – such as the Town of Bedford's power company, serving under 6,000 consumers, whose rates increased by 13% in 2016 – while ignoring the data from the larger utilities, such as Dominion Power (serving over 2 million consumers), whose utility rates had only increased by .3% over the prior five years.

291.    As a result of its review, GoodLeap issued four failing audits to Power Home with each audit concluding that using inflated 5.5% utility escalators in sales proposals was an "unacceptable / unexplained major audit finding."

292.    But Power Home appealed to GoodLeap's executive vice president to overrule GoodLeap's own auditors and compliance department, which he did.  He told his compliance staff

in an email (on which Power Home was copied) to accept Power Home's data and agree to its use in sales proposals for GoodLeap's loans, even knowing that GoodLeap had twice rejected that data as inaccurate and cherrypicked.

293.    Ultimately, GoodLeap made over 150 loans to Power Home consumers in Virginia that relied on proposals whose calculations used 5.5% escalators to overstate solar's benefits and reduce its apparent costs by tens of thousands of dollars.  It did so even though its own staff said these escalators were "extremely high," inaccurate, inappropriate, and "a big selling point."  It took no corrective action to inform past or future loan consumers of this issue; it did not forgive, reduce, cancel or change any loan agreements or terms for any of these loans; it sold some of these loans to investors; it continues to service these loans; and it continues requiring Virginians to pay these loans in full.

294.    Mosaic brokered, arranged, funded, or originated over 120 loans to Power Home consumers in Virginia during the period the 5.5% escalator was used.

### 3.  A 4% Escalator Intentionally Exaggerated Solar's "Savings" from 2018 to 2019

295.    The utility escalator deception continued from mid-January 2019 to February 2021 with a 4% utility rate escalator.

296.    During this time,

- Mosaic brokered, arranged, funded, or originated over 600 loans to Power Home consumers in Virginia.
- GoodLeap funded and originated over 300 loans to Power Home consumers in Virginia.
- Sunlight brokered or arranged over 50 loans to Power Home consumers in Virginia.
- Cross River Bank funded and originated 27 of the loans brokered or arranged by Sunlight.
- Technology Credit Union funded and originated 22 of the loans brokered or arranged by Sunlight.

297.    GoodLeap and Power Home knew that a 4% escalator misrepresented and inflated Virginia's past utility rate increases, as alleged above.

298.    Sunlight also knew this.

299.    From April 2018 through September 2018, Sunlight was negotiating the terms under which it, Cross River Bank, and Technology Credit Union would extend loans to Virginia consumers for Power Home purchases.

300.    The utility escalator repeatedly arose as one of the contested deal terms, and Mr. Waller and Mr. Klink were repeatedly involved in discussions about it.

301.    On April 5, 2018, Sunlight sent Mr. Waller and others a "Sunlight Escalator Analysis," with comprehensive residential utility rate data for all 50 states.

302.    The analysis Sunlight sent showed that Virginia's residential utility rates had increased 1.7% over 5 years, 3.37% over 10 years, and 2.79% over 15 years.

303.    Yet on August 10, 2018, Sunlight and Power Home agreed in writing to use a "4% maximum proposal escalator" for Virginia and North Carolina.

304.    Sunlight knew the 4% escalator for Virginia was not supported by its own data, was chosen based on cherrypicked numbers, and knew even those numbers did not support a 4% escalator.

305.    In November and December 2019, investment bankers also repeatedly informed Power Home that its estimates were unsound, writing: "Projected utility rate increase is based on the 15 highest price growth utilities within each market which skews estimate upward . . . What is the rationale for using this methodology vs average retail energy price by state?"  They then provided the actual numbers from the Energy Information Administration for each state, proposing

52

that Power Home use the actual numbers in all marketing materials, otherwise it would have a "due diligence problem."

306.    But not until mid-February 2021 did Power Home finally start using utility rate escalators matching the actual data.

307.    Power Home was reluctant to reduce its escalator because, in Mr. Klink's words, it was a "main component" of sales: in a March 5, 2019 email to Mr. Waller and others discussing the federal solar tax credit's potential expiration he wrote that the "main component to help offset this will be the continuing rise of utility cost for the next 3 years," noting that with "4% increases in utilities/year" plus other factors, "we'll be exactly where we need to be to continue selling at the same clip."

308.    Ultimately, sales presentations from September 2017 through mid-February 2021 used inflated escalators to exaggerate the costs and inflate the savings from solar purchase and loans, materially misrepresenting the actual losses and risks Virginia consumers faced, often by tens of thousands of dollars.

309.    Conversely, had consumers been provided with sales materials with accurate utility rate increase data, they could have had an informed understanding about the value and risks of solar loans and purchases, especially that it might take many years (or even decades) before annual utility bill savings from solar exceeded solar loan costs.

## V. Long Term Savings Claims Deceived Consumers About the Value and Risks of Loan-Backed Purchases

310.    Manipulating utility escalators was only one way to mislead consumers about so-called "savings."

311.    "Savings" claims were part of sales training materials, presentations, proposals, and brochures, including the emails and sales brochures shown in section IV.C. above and the proposal content shown below.

312.    The "savings" claims' specifics changed from 2017 to 2022, but one constant was deception: they used misleading comparisons to deceive consumers about losses they faced in the short-, medium-, and long-term from loan-backed solar purchases, while relying on deceptive representations of existing facts, such as the utility escalator described above.

313.    Long-term "savings" claims were a centerpiece of sales presentations from 2016 until mid-February 2021, while short-term savings claims were the focus from February 2021 until Power Home's bankruptcy in October 2022.

314.    The long-term "savings" claims had two iterations in Virginia.

315.    From June 2017 through October 2019, proposals calculated and displayed "25 Year Savings" or "25 Year Estimated Savings" as shown in section IV.U.2. above.

316.    From November 2019 to mid-February 2021, when loan terms generally lengthened to 25 years, the proposals switched from 25-year estimates to 30-year.

317.    These 25- or 30-year estimates deceived in three main ways: (1) they used a period longer than the loan term to claim greater "savings"; (2) they concealed and failed to tell consumers that they faced years of losses during the loan term; and (3) they relied on inaccurate and inflated assumptions, such as the utility rate escalators described above and the production and efficiency assumptions described below.

318.    The first deception – using a savings period five or ten years longer than the actual loan term – was intentional.

54

319.    As Mr. Klink explained in a July 4, 2019 email exchange with GoodLeap, he was reluctant (at the time) to adopt 25-year loans because the sales proposals relied on data from five years after loans were paid off to "illustrate" "free power" and "create value" for the consumer. So, for a 20-year loan, proposals needed to have 25 years of estimated savings because, in Mr. Klink's words, "the 21-25yrs we need in our proposal to create value as that's illustrated to the consumer as free power."

320.    For instance, as shown below, a September 9, 2019 sales proposal to a Spotsylvania, Virginia household prominently displayed "25 Year Estimated Savings" of $14,535 to sell a 20-year Loanpal / GoodLeap loan:



321.    Later, the same proposal's "Total Estimated Savings" page also had a "25 Year Estimated Savings" calculation as shown below:



322.    In both cases, the 25-year estimates were emphasized through their placement and their large fonts.

323.    These savings calculations deceived by relying on five years of savings from years 20 to 25, after the 20-year loan was paid off – they used these years to "create value" as Mr. Klink put it.

324.    These savings calculations also deceived by obscuring what happened to the consumer in years 1 to 20. Many consumers, including the one in the example above, faced years of losses, possibly throughout the whole 20-year loan term. Using inflated future estimates from years 20 to 25 obscured the years of losses Power Home and the Lenders knew consumers faced.

325.    GoodLeap agreed to and understood this approach. In the exchange with Mr. Klink in July 2019 about lengthening loan terms to 25 years, GoodLeap's sales director wrote, "I understand your price structure, the cash flow and the late term break even component. My advice, hammer the math and find a way to make it work." Or, put simply, at high prices ("your price structure,") consumers faced a "late term break even," meaning losses until late in the loan term.

326.    Ultimately, GoodLeap and Power Home, led by Mr. Klink, found a way to "hammer the math" – they would start using 25-year loan terms but would extend the savings estimates in the proposals another 5 years to 30-year estimates.

327.    Around January 3, 2020, at Mr. Klink's direction, Power Home's sales proposals switched to 30-year savings estimates.

328.    This change coincided with and was driven by two other changes: battery sales, which drove prices even higher as described in section IV.F; and the adoption and sale of 25-year loans as described in the same section.

329.    These 30-year estimates were used from January 2020 until February 2021.

330.    For instance, in a July 21, 2020 proposal to a Spotsylvania, Virginia household, who took out a 25-year GoodLeap loan, the third page showed the "30-Year Estimated Savings" as indicated in the screenshot below:



331.    And on the proposal's sixth page, this 30-year savings was packaged as the "Estimated Savings," as shown in this screenshot:



332.    In both cases, the 30-year estimates were emphasized through their placement and their large fonts.

333.    In this example, the 30 year "Estimated Savings" of $39,676 deceived because it relied on five years' worth years of estimated savings AFTER the 25-year loan was paid off.

334.    Had the "Estimated Savings" corresponded to the 25-year loan term, it would have dropped by tens of thousands of dollars.

335.    During this period, proposals also used 30-year estimates for 20-year loans, which exaggerated savings even more.

336.    This proposal and others could have, but did not, disclosed to consumers that they faced years of losses before they could see any savings.

337.    Additionally, the proposals relied on deceptive inputs.  For example, the 30-year savings shown above relied on an inflated 4% annual utility escalator as described in section IV.U.3.

338.    Had the "Estimated Savings" used an accurate escalator and corresponded to the 20-year loan term, the "savings" might have vanished altogether, and consumer could have been

58

told they faced cumulative losses over the loan term and potentially losing money every month (on average) for a decade or more.

339.    In training, salespeople were told to focus on these long-term savings numbers, while vouching for the numbers' accuracy; trainers told them, "we are giving the consumer an accurate representation of what they will be saving vs. their current consumption."

340.    Ultimately, these deceptions – using a period longer than the loan to increase "savings," using inaccurate and inflated inputs, and failing to tell consumers that they faced years of losses – were done for all sales presentations for every loan-backed purchase from Power Home from 2017 to February 2021.

341.    A fourth deception was employed from May 2017 to October 2019 to further increase long-term "savings." During that period, proposals presented consumers with "Total Savings" that included "Instant Equity from Going Solar," which was calculated by adding 4.1% of the home's value.

342.    For example, in April 2018 a Virginia Beach consumer took out a 20-year GoodLeap solar loan. As shown below, the consumer's sales proposal claimed a "Total Savings"

and a "25 Year Savings" of $48,260, which included $10,815 in "Instant Equity from Going Solar." [Red circle added.]



343.    As shown, this $10,815 of "Instant Equity from Going Solar" was added to the "25 Years of Utility Bill Savings," to offset the "Costs of Solar" (including the loan costs) and produce an even greater "25 Year Savings" of $48,260.

344.    In fact, consumers did not receive "Instant Equity from Going Solar."

345.    Instead, their homes' equity was generally reduced by the solar loan amount, which the lenders secured by publicly recorded financing statements, impairing home titles and requiring payoff from the homes' equity.

346.    And with substantial dealer fees imposed on solar loans, even if solar installations did create equity, it would take years for consumers to pay down the loans to the point where they received any.

347.    Messrs. Klink and Waller actively participated in the decision to use long-term savings estimates.  This included reviewing, editing, and approving the layout, content, and exact wording of proposals using these long-term savings estimates.

348.    For instance, from April 16 to April 23, 2020, Mr. Klink repeatedly reviewed, discussed, met with staff, and revised proposal content, including graphs and content with these 30-year savings estimates.  Mr. Waller was copied on, commented on, and ultimately approved of these revisions.

349.    However, by late 2020, prices were too high for even inflated long-term savings claims to work effectively, and Power Home's potential investors were pressuring it to use more accurate utility rate escalators.  It was time for a new approach.

## W.  Misrepresenting "Savings" By Omitting Loan Costs from Key Savings Comparisons and Claims.

350.    In February 2021, sales proposals changed to focus on a different misrepresentation.

351.    This misrepresentation was to claim "savings" by omitting loan costs from key savings comparisons and claims.

352.    In February 2021, Power Home's Director of Sales explained this change to all sales staff in an email, writing: "We will be removing the 25/30 savings and cost information" and "We will spend more time showing the monthly savings post solar."

61

353.    Removing and downplaying the "cost information" from sales proposals allowed for "savings" claims even when, in fact, costs could and generally did outweigh savings.

354.    This was a purposeful deception. It was implemented with Klink's and Waller's approval because other deceptions were failing or could no longer be used.

355.    The revised proposals used from February 2021 through Power Home's bankruptcy in October 2022 relied on two main deceptive "savings" comparisons.

356.    First, salespeople unveiled short- and long-term "savings" from energy efficiency products (as shown in the screenshot below from a model training video) without telling consumers that these "savings" did not factor in loan costs.



357.    This graphic claimed savings or reductions from energy efficiency products (described further below in section IV.X.)    Those savings were $37.54 initially (shown in large green font in the text on the left) and then increased over 25 years using the utility rate escalator (shown in the gray area on the line graph).

358.    The video instructed salespeople to tout the "savings" shown in this proposal by saying, "Now, what that's going to do is take your $171 [electric bill] all the way down to $133, saving you $37 a month. OK, so that right there alone is going to be huge for you."

359.    Salespeople were also trained to drag their cursor along the graph showing these savings increasing over time.

360.    Later in the presentation, salespeople were to show consumers further "savings" under headings like "Electricity Cost Reduction," "Electricity Bill Cost," "Utility Bill Cost," or "Electric Bill Comparison."

361.    The model training video screenshots below illustrates how this "Electricity Bill Cost" and "With Solar" presentation and proposal appeared:





362.    In this video, while the screenshot above was shown, the following dialogue trained salespeople to emphasize the solar purchase's savings:

> Salesperson: So when we talk about your electric bill costs, uh, you currently, have a lower average [monthly electric bill of] $171.  With solar that's going to drop OVER a HUNDRED dollars….
>
> Customer: Wow!
>
> Salesperson: So that is going to be beneficial for you financially, ok?

363.    But, in fact, in the example above – the very example presented in the training video – the consumer is not going to save money because loan costs exceeded these "savings."

364.    Had loan costs been factored into the comparisons shown, this consumer would be losing $96.73 a month on average in Year 1.  But he is not told this.

365.    Nor is the consumer told he would lose money every month on average for all 300 months of the loan term.

366.    Instead, salespeople were trained to tell consumers that their bills will "drop," that the loan-backed purchase "is going to be beneficial for you financially," and that the loan-backed purchase will "be huge for you."

367.    Salespeople could even click on "Preview Bills" which brought up graphs showing yearly savings starting in Year 1 and increasing each year through Year 25 as shown in the screenshots below. These bill previews deliberately omitted the loan bills to produce these savings.



368.    These before-and-after solar comparisons and bill previews touting illusory "savings" proved to be an effective technique and was used in real life proposals and sales presentations throughout Virginia.

369.    For example, the "Electricity Cost Reduction" page used in a March 10, 2021 proposal to a Cave Spring, Virginia household showed a cost reduction from $143 to $57.



370.    Had this comparison included the consumers' loan costs, there would be no "Reduction."  The proposal could have, but did not, show the Cave Spring household they faced an estimated bill of $273 in the first year (including electric and loan costs), a $130 INCREASE from their current bill.

371.    Similarly, the "Electric Bill Comparison" page from a May 3, 2022 proposal presented to a Salem, Virginia household shows the household's "average monthly payment" decreasing from $195.42 "Pre-Solar" to $65.31 "Post-solar," a $130.19 reduction.



372.    Had this comparison included loan costs, the Salem, Virginia household could have been informed they would see no bill decrease.  The proposal could, but did not, show them they faced an estimated bill of $371.31, not $65.31, a $175.89 INCREASE from their current bill.

373.    By omitting loan costs, these proposal iterations showed consumers a misleading "reduction," "comparison," or "savings" in their "bill", "cost", or "payment."

374.     Put simply: Power Home trained salespeople and designed sales proposals to pass off money-losing products and loans as beneficial.

375.    Conversely, these proposals, these sales trainings, and the thousands of actual sales meetings using this content could have – but did not – easily informed consumers that they would lose money by comparing current bills with the new loan bills and utility bills the consumers would face.

376.    The omission of loan costs from these comparisons was intentional.

67

377.    In March 2022, June 2022, and July 2022, Power Home's digital proposal software provider, Aurora Solar, Inc., repeatedly met with and emailed Power Home's sales managers asking it to change its "Savings Narrative" to "include all costs," including loan and energy costs, on these "Bill Overview" pages specifically, and generally when discussing savings, costs, or bills.

378.    Aurora showed how there was a toggle—a simple mouse click—that would display the "finance payment" (the loan payment) when comparing pre- and post-solar costs.  The toggle appeared as following on Power Home's dashboard for its digital proposals.  The toggle was switched "off" for Power Home.



Finance Payment on Post-Solar Card

Toggle to control the visibility of the monthly payment for the selected financing option. This setting does not impact the pricing & financing page.

379.    Had Power Home switched this toggle "on," then consumers would have been shown their loan costs ("the monthly payment for the selected financing option") along with their utility "savings."  But it refused to do so.

380.    Aurora also offered to incorporate loan costs into calculations for "Lifetime Savings" and "Levelized Cost of Energy."  It explained these calculations could "take into account all the financial costs and benefits of going solar," and could display that cost/benefit data in proposals to inform consumers about actual costs and savings from solar purchases with loans.

381.    Power Home rejected this too.

382.    Then, in June 2022, GoodLeap made the same points.

383.    A GoodLeap auditor audited a sample of four of Power Home's sales proposals.

384.    The auditor drilled down on the "Utility Bill Cost" page, as shown in this screenshot from the auditor's notes, which includes his yellow highlights.



385.    The auditor told Power Home the "Utility Bill Cost" page specifically – and for all digital proposals generally – the "Value Proposition is misleading," and was a "misrepresentation of the performance, savings, or value provided by the products installed."

386.    The auditor explained the "Utility Bill Cost" graphic "shows a lower cost over 25 years but does not take into account the cost of the system.  The numbers shown this way can be misleading to the consumer as this system looks to be saving the consumer money over 25 years, which is not the case."

387.    The auditor appended his own saving calculation to his email to Power Home, which showed the consumer would lose $33,001.56 with the 25-year loan and would lose money on average every month until the loan was paid off.

388.    In contrast, Power Home's presentation was implying the opposite: a 25-year savings of $58,799 and immediate monthly savings of $139.77.

389.    GoodLeap's Director of Partner Relations followed up on the June 2022 audit, emailing Power Home's managers and counsel, including Mr. Klink:

Hi Team, I'm much more concerned about the value proposition. To be clear - we cannot accept avoided utility cost or 'gross' savings on the proposals. Rather, we need net savings displayed. As you can see on this proposal, the consumer looks to be saving $140 a month. In reality, once you factor in the loan payment, she is paying more after going solar.

390.    This email reiterated GoodLeap's view that sales proposals used to sell its loans misrepresented the "net savings" or the "value proposition," which must, "factor in the loan payment."

391.    As GoodLeap's email explained, had Power Home's proposals showed consumers their true "value proposition" with their "net savings" – including both the "new" utility bill and the new loan bill – the consumer who "looks to be saving $140 a month," would, instead, have been informed that she would actually be losing money.

392.    Power Home's outside counsel responded to GoodLeap on Power Home's behalf, cc'ing Mr. Klink.

393.    Counsel wrote that his email followed "*high priority*" internal discussions at Power Home.

394.    Counsel said Power Home "made the decision awhile ago" to stop providing consumers the "overall economic value proposition" or "overall potential systems savings (versus estimates of reduction in electric bills)".

395.    One reason he cited for this change was that increasing battery sales were increasing system costs.

396.    In an email exchange a week later, GoodLeap reiterated that "It's standard practice in the solar industry to show true estimated savings by displaying the loan payment (system cost) in conjunction with the avoid utility costs."  To just show consumers their future utility bills alone, GoodLeap explained, "doesn't paint a clear picture to the consumer what their actual estimated

savings will be."   And it continued, "After reviewing some recent proposals sent over to GoodLeap, the consumers are actually paying more for the electrical needs (remaining UB [utility bill] + loan payment) than prior to going solar."

397.    GoodLeap's email contrasted what the proposals were showing with what they should show: the "true estimated savings," the "actual estimated savings," the "savings value proposition," the "total estimated cost," or, in laymen's terms, what "the consumers are actually paying."

398.    GoodLeap's auditors ran four consumers' proposals through its own "savings calculator."   Each "savings calculator" – using the solar proposals' own numbers – revealed consumers were told and shown the opposite of what would happen to them: each proposal showed initial and 25-year savings, when, in fact, each would lose money initially and over 25-years.

399.    Through this audit, GoodLeap and Messrs. Waller and Klink were on notice that consumers were "actually paying more for the electrical needs . . . than prior to going solar," but sales proposals and presentations were misleading them about this.

400.    And GoodLeap and Messrs. Waller and Klink were all on notice this misleading practice had been occurring for "awhile."

401.    Despite these conclusions, GoodLeap's audit went nowhere.

402.    Power Home did not markedly change its practices or its sales proposals after the audit, from June 2022 until its bankruptcy in October 2022.

403.    And GoodLeap continued to make loans to Power Home and GoodLeap consumers in Virginia whose sales pitches used proposals like those it objected to.

404.    GoodLeap knew these consumers were shown sales proposals and presentations that its employees had deemed "misleading," about what they called (in various formulation) the

71

"true estimated savings," the "actual estimated savings," the "savings value proposition," the "total estimated cost," or what consumers are "actually paying."

405.    Moreover, on information and belief, GoodLeap did not do anything to modify or forgive any of the loans sold using the misleading proposals prior to its audit, nor did it reject, modify, or forgive any of the loans it entered into after its audit.

406.    Dividend, Mosaic, Sunlight, Cross River Bank, and Technology Credit Union all had access to proposals with this same misleading content.

407.    For example, Sunlight had numerous emails with Aurora and Power Home regarding the content and presentation of sales proposals from December 2020 through August 2021.

408.    Dividend also received these sales proposals and a model training video showing how they were presented.

409.    Dividend also expressed concerns about these proposals. For example, in a May 2021 email, it asked Power Home how they would, "deal with a consumer who complains that their electricity bill wasn't reduced by the amount in the sales proposal and claims they paying [*sic*.] more than expected on a monthly basis between utility bill & solar loan?"

410.    Ultimately, from mid-February 2021 to October 2022, these misleading comparisons that omitted loan costs were used in Virginia to sell approximately

- 322 Dividend loans;
- 426 GoodLeap loans;
- 2 Mosaic brokered or arranged loans;
- 427 Sunlight brokered or arranged loans, of which
- 210 were Cross River Bank loans; and
- 191 were Technology Credit Union loans.

72

## X. Deceptive Energy Efficiency Product "Savings" Claims

411.    Beyond omitting loan costs, the "savings" claims shown above relied upon reductions in energy use or "savings" from energy efficiency products.

412.    Power Home sold energy efficiency products from 2017 until its October 2022 bankruptcy.

413.    The energy efficiency products changed slightly over the years, but one purpose remained the same: offset high prices by claiming these products would "reduce" or "save" up to 25 or 30% of a consumer's current energy consumption.

414.    These energy efficiency "savings" were material to the sales pitch for products and loans.

415.    As Sunlight observed in a June 16, 2020 email to Mr. Klink, in the sales proposals, "a significant portion of lifetime savings is through energy efficiency consumption savings."

416.    Sunlight was correct: from 2017 through 2022, sales proposals consistently claimed energy efficiency products would significantly increase "savings" to reduce the purchases' and loans' apparent cost.

417.    For instance, in 2017, sales proposals included an "Annual Performance Summary," claiming "Energy Efficiency Improvements" such as LED lights, surge protectors, and insulation would "Reduce annual energy use by 30%."

418.    In turn, these 30% reduction claims were baked into every estimate of monthly, yearly, and lifetime savings in those proposals.

419.    From 2018 through 2022, the efficiency product lineup changed slightly while claiming 25% savings or reduction.

420.    In turn, these 25% savings or reduction claims were baked into all estimates of monthly, yearly, and lifetime savings shown in these proposals, as illustrated in the proposals shown in sections IV.U.2 and W-X.

421.    The energy efficiency claims worked in tandem with the utility escalator claims alleged in section IV.U and the long-term saving claims in section IV.W: initial savings of 25% or 30% were then escalated and projected over 25 or 30 years, compounding the savings over time.

422.    Power Home trained salespeople to tell consumers its energy efficiency products savings claims were "conservative," "very conservative," or a "very, very conservative" estimate.

423.    It also trained salespeople to tell consumers that even if they did not use these products well, there would still be a 19-20% savings or offset.

424.    It also trained salespeople to tell consumers specific "savings" that individual energy efficiency items were "going to have."

425.    For example, in the 2021 Official Presentation, sales people were trained to say, "So at the top we've got blown in insulation, we're going to come in and do R-49, Pink Panther R-49 blown in insulation that's going to have a 9% impact." [Underlining added.]

426.    Another claim was that "air sealant tape" would reduce consumption by 2% because installers would find and seal all leaks in a consumer's HVAC ducts and system.

427.    These energy efficiency claims were deceptive for three main reasons.

428.    The first deception was to provide specific and precise energy efficiency reduction figures, when, in fact, Power Home and lenders knew that energy efficiency reductions "vary widely" (as Sunlight put it) depending on the home's specifics – different homes have different responses to energy efficiency measures depending on their airtightness and other factors.

429.    Specifically, in a June 6, 2020 email, Sunlight described a "core challenge we've been working through internally and with our lenders is that a significant portion of lifetime savings is through energy efficiency consumption savings. With EE [energy efficiency] – each house is different so the savings curve will vary widely."

430.    So Sunlight, Power Home, and Sunlight's "lenders" – which included Technology Credit Union and Cross River Bank – knew or should have known that energy efficiency savings "will vary widely" because "each house is different."

431.    Likewise, GoodLeap knew energy efficiency savings would vary from house-to-house.  Its December 2021 Contractor Oversight Policies and Procedures manual required a "pre-install audit and testing" on each home if energy efficiency savings "is guaranteed," but NOT if the savings was estimated.

432.    The "pre-install audit and testing" GoodLeap suggested is used to accurately determine the impact of energy efficiency measures – like adding insulation – on the specific home.

433.    Without such an audit, as GoodLeap knew, estimates like the ones made in the sales proposals were speculative, inaccurate, and could not be home-specific.

434.    The second deception was to claim energy efficiency reductions for products consumers already had, or for products consumers could not use, or both.

435.    For example, one claimed reduction was that delivering consumers a box of LED light bulbs would reduce their whole home's electricity consumption by 4% for 25 years.

436.    Proposals and sales presentations relied on this 4% reduction claim even when it could not apply to a given home, including homes already using LED lights, whose fixtures did not match the bulbs provided or wattage provided, or homes of different sizes with more fixtures in their house than the bulbs provided.

75

437.    Likewise, Power Home claimed $10 worth of faucet aerators and showerheads would reduce an entire home's electricity consumption by 5% for 25 years.  Proposals and sales presentations relied on this 5% reduction claim even when it could not apply to a given home, including homes with such aerators or showerheads already or with more faucets or showerheads than what was provided.

438.    Power Home also claimed attic insulation would reduce electricity consumption by 9% for 25 years. But it delivered the same amount of insulation regardless of the home's size and attic, which would not yield 9% savings over 25 years for homes that did not have attics, had attics only over a small portion of the home, which already had sufficient attic insulation, or for which the amount of insulation Power Home provided was insufficient.

439.    The third deception was to assume energy efficiency items would always be properly installed, when, in fact, installation teams struggled.

440.    For instance, proposals claimed 1-2% savings from Nest Thermostat installations. But Power Home (including Messrs. Waller and Klink) knew its installers struggled to install and program them, with Mr. Waller writing, "Too many HVAC options made it hard to program and use."  So it started delivering the Nest Thermostats in a box for consumers to install and program themselves.  But in all cases, its sales proposals and presentations assumed and calculated savings as if these thermostats were always installed and programmed perfectly.

441.    Attic installation was also often subpar: sometimes installers just dropped insulation off and did not install it, or they rushed through the work.  This was never accounted for in the estimated 9% savings from attic insulation, which assumed that in all cases, products would be properly installed.

## Y.  Messrs. Klink and Waller Actively Participated in Making Energy Efficiency Claims

442.    Messrs. Klink and Waller actively participated in making energy efficiency savings claims, including decisions on

- which products to sell and stop selling;
- how and when to install or deliver these products;
- how sales proposals would calculate and present savings from those products;
- the savings amounts claimed for each product and overall;
- the content and use of advertising, sales brochures, and other marketing materials claiming savings from these products;
- responding to complaints about installation of these products;
- collecting and presenting a "Hall of Shame" of bad installation photos; and
- including a signed letter from Mr. Waller in purchase agreements that said in part: "We are proud to provide our SMARTPWR360 package, a suite of products and efficiency recommendations *that puts you in charge* of how efficient your home becomes and *how much money you will save*" [Emphasis added].

443.    Both used future energy efficiency claims to make actual prices appear lower and savings appear greater.  For instance, Mr. Klink wrote in October 2019 that "additional savings" in sales proposals from energy efficiency products could "neutralize" price increases.

444.    Both were aware of complaints regarding the installation of energy efficiency items, including Nest thermostats and insulation.

445.    Both knew consumers regularly complained they did not have utility bill savings from reduced consumption.

446.    Both could have, but did not, direct Power Home to see if purchasers actually achieved any real-world savings from the sold energy efficiency products.

## Z.  Lenders Knew Purchasers Were Not Receiving the Claimed Energy Savings

447.    The Lenders knew Power Home used energy efficiency claims to claim savings on purchases and loans and to offset high prices.

448.    In May 2021, Dividend suggested that Power Home's energy efficiency claims were a reason to permit prices that it thought were "incredibly high."

449.    GoodLeap knew energy efficiency products were being used to increase prices, loan amounts, and consumers' debt.  In September 2019 it specifically analyzed their impact on consumers' debt-to-income.

450.    In April and June 2020, Sunlight noted how sales proposals used energy efficiency reduction claims to "drive" or support "lifetime savings" claims.

451.    Around that time, Sunlight, Technology Credit Union, and Cross River Bank increased their loan price limits for Power Home (despite their concerns about the impacts on consumer savings) because they chose to believe that energy efficiency product savings might offset the consumer harm from higher prices.

452.    However, on June 16, 2020, these lenders made their price increases contingent on Power Home adding tiny disclaimers to its proposals, with Sunlight writing that "this additional disclosure helps provide us the security required."

453.    The result was that these lenders allowed Power Home to increase prices and allowed sales proposals to claim "significant lifetime savings" from energy efficiency products, despite their reservations, so long as there were tiny disclaimers.

454.    For example, in this screenshot of a page from a consumer's October 15, 2020 sales proposal, almost every graph, graphic, and number shown relies in whole or in part on a 25% "reduction" from the energy efficiency package, including the emphasized "Estimated Monthly Payment" and "30-Year Estimated Savings."  Sunlight's disclaimers are in miniscule font, including the footnote on the bottom right (called out in the image below), which reads, in part, "Savings may vary by property and are not guaranteed."

78



455.    Claiming "savings may vary by property and are not guaranteed" in a miniscule font, while at the same time – in far larger fonts and graphics throughout the proposal – claiming, calculating, and relying on specific 25% savings for that specific consumer's property did not convey the considerable risk that that consumer's home would not receive anywhere near the 25% savings claimed.

456.    All Lenders were on notice from complaints that consumers were not receiving the energy savings that the proposals told them they would.

457.    In investigating these complaints, Lenders checked the energy production from solar panels but did not check to see if consumers actually received savings or reductions from energy efficiency items.

**AA.    The Solar Production Savings and the Faulty Assumptions Underlying It**

458.    Besides energy efficiency products, the other component of the "solar offset" was the solar panels' energy production.

459.    Sales proposals estimated this energy production as a percentage and in kilowatts.

460.    For instance, on or around July 28, 2020, a consumer in Virginia Beach was shown a digital proposal with a pie chart and text showing that "Post-Install," solar production would reduce their current bill by 48%, as follows:



461.    In the proposal shown above, the pie chart shows "Solar Production 48%," and a corresponding 48% for "Estimated Solar Offset of Current Consumption," under the heading "Est. Post-Install Energy Breakdown."

462.    From 2017 through Power Home's October 2022 bankruptcy, all proposals and sales presentations used and relied upon similar estimates of and assumptions about "Solar Production," although the graphics and accompanying text varied.

80

463.    There were several faulty assumptions behind these production calculations.

464.    First, they assumed that all consumers' solar panels would be properly installed and functioning after the purchase.

465.    In reality, Power Home was systematically behind on installations, because it was selling systems faster than it could install them.

466.    And, in reality, Power Home's installations could be deficient, damaging structures, yards, trees or plants, pipes, plumbing or electrical systems, and misinstalling solar panels, electrical boxes, or batteries, so they failed to work properly (or at all).

467.    So, in reality, not every purchaser received a system that reached its estimated production after or "post-" installation.

468.    Power Home, Klink, Waller, and the Lenders knew that not every consumer would reach its estimated production or estimated solar offset at the time of installation.

469.    For example, in a June 2022 email, GoodLeap's directors observed that Power Home had a 1,200-consumer backlog for operational systems and "They have missed the mark on their expectations and continue to struggle to meet timelines."

470.    GoodLeap and the other Lenders systematically tracked Power Home's installation delays and problems.

471.    But the sales proposals did not consider or factor in the possibility of installation delays, problems, or risks into their estimated production calculations, which made these estimates inaccurate at the time they were made and afterwards.

472.    Moreover, Power Home's energy production and solar offset calculations assumed that the solar panels, once installed, would continuously function during their lifetime.

473.    In reality, Power Home's systems sometimes stopped working, for a variety of reasons, including installation errors and malfunctioning components.

474.    But Power Home's proposals did not consider or factor the risks that systems would stop working into its estimated production calculations, which made these estimates even more inaccurate at the time they were made and afterwards.

## BB.    Delay, Downplay, and Mislead Consumers About Prices and Loan Costs: "Our average person pays this off between six to eight years."

475.    Only after consumers had been repeatedly told and shown their so-called "savings," did Power Home's salespeople discuss the loans.

476.    Power Home trained salespeople to present cost and loan specifics at the "last stage" as they called it.

477.    Conversely, it trained salespeople not to give consumers price specifics early in the pitch, even training them to falsely tell consumers at the beginning of the sales pitch that it would only take 10 minutes to get the price, when, in fact, it would take more than an hour.

478.    The sales proposals generally had a single page describing loans or financing.

479.    The financing and loan page and sales discussion deliberately came after comparisons showing the consumer's "savings," including the comparisons described in sections IV.W-X, to convince consumers that they would be saving money.

480.    A model sales training rushed the consumer through the "Financing" page, telling salespeople to say, "So what we have to do now is to go through the rest of this really quick."

481.    When describing the financing or loan, Power Home also trained salespeople to tell consumers that despite 20- to 25-year loan terms, "our average person pays this off between 6 to 8 years."

82

482.    Power Home's "Official Presentation" in 2021 included this 6- to 8-year pay-off claim, training salespeople to say, "The length of the loan is 25 years. It's structured that way because we want to make solar affordable for everyone. We want everybody to have the ability to own their own power. And so if you extend it out that long and it makes it affordable for everyone, but our average person pays this off between six to eight years."

483.    The claim that the average Power Home consumer paid off their 20 to 25-year loans in 6- to 8-years was false as was the claim the loan was "affordable for everyone."

484.    In reality, when this claim was made – from at least 2021 through 2022 – Power Home did not even have consumers who had had 25-year loans for 6 to 8 years, since it started operations in 2015, started using loan financing extensively in 2017, and started using 25-year loans in 2020.

485.    Furthermore, the loan data that did exist showed that the average consumer was not paying off loans early (unless they sold their house and were forced to pay off their loan).

486.    One purpose of the false 6- to 8-year pay-off claim was to mislead the consumer about the length and risk of the loan.

487.    Another purpose of the false 6- to 8-year pay-off was to convince the consumer that savings from the solar purchase would quickly and considerably exceed costs, allowing for an early loan payoff.

488.    But, in reality, the opposite was happening: consumers' loan costs exceeded their savings, and they generally were not able to pay off loans quickly.

489.    And Power Home and the Lenders knew that from their proposal data, loan data, and from consumer complaints.

83

**CC.    Deceptively Reduce the Loan Amount by the Tax Credit**

490.    When finally providing consumers with the loan amount, Power Home trained salespeople to immediately subtract a 26% or 30% federal tax credit from that loan amount.

491.    For example, Power Home's "Official Presentation" taught salespeople to provide the federal tax credit calculation and the loan amount at the same time, as follows: "So, the total system cost is that $70,654, BUT just like I was talking to you earlier about the federal tax credit – this is the dollar for dollar tax credit, not refund, that you could be eligible to get depending on how much you paid in in federal taxes. So you're eligible to get $18,370 back, which is 26% of that system cost. And we do the math: it's just– you take the $70,654 and minus that $18,370 from it, which means Uncle Sam's going to reduce that payment down for you to $52,284."

492.    Likewise, in Power Home's role-played training, the salespeople provided the federal tax credit calculation immediately before and after revealing the loan price, stating, "your tax credit for this system is going to be $14,512, okay? So a BIG chunk of the system right now is getting paid. And that's important because that is subject to change. So by you making the decision to go solar today, we are going to be able to offer this tax credit to you. Okay?"

493.    Then after the price is revealed, he again immediately discusses the tax credit: "So the total in entirety is $55,816. Okay. Now, that's that before the tax credit, right? And so you take tax credit out of that and that's how that works."

494.    Phrases like – "we do the math," "Uncle Sam's going to reduce," "a BIG chunk of the system right now is getting paid," and "you take the tax credit out of that and that's how that works" – all tell, suggest, or imply that the consumer will or is likely to receive the tax credit.

495.    By default, sales proposals included and deducted the full federal tax credit when displaying the total or monthly solar loan price.

84

496.    For example, on March 10, 2021, a Cave Spring consumer was shown a proposal in which, as shown below circled in red, the tax credit was included, shown explicitly in the statement "Fed. Tax Credit $12,240.80" under "How Will You Use Your Incentive?" and implicitly by lowering the monthly payment shown under "Your Estimated Monthly Payment," which would rise in months 19-240 if the consumer did not receive the credit.



497.    That proposal also deducted the full federal tax credit from the loan amount to emphasize a "Net System Cost."  As shown below, the Net System Cost of $34,839 was displayed in a larger, colored font than the "Loan Amount" of $47,080, even though the loan amount was certain but the tax credit and the "Net System Cost" calculation were not.



498.    Proposals used from May 2017 to April 2021 had similar content to the one above.

499.    Proposals changed in April 2021, but they continued to assume consumers would receive the full federal tax credit.  For example, as shown below, a June 2022 GoodLeap audit examined a proposal whose financing page showed a "Net Cost" and a "Monthly Loan Payment" assuming the consumer receive the tax credit  as shown by the checked "ITC Pay Down Applied."

500.    In reality, many consumers were not, in fact, receiving the tax credit or applying it to their loans.

501.    For example, in April 2018, the Kroll Bond Rating Agency concluded only 3-32% of Mosaic consumers applied their tax credits to Mosaic loans.

502.    In March 2019, Power Home's equity owners emailed Mr. Klink and others that "30% of the consumers do not apply FITC credit to reduce their loan amount with lenders like Mosaic," because, in part, "a number of consumers" do not qualify for the tax credit in year one.

503.    In May 2018, GoodLeap's Chief Operating Officer told Mr. Klink that GoodLeap's data showed, "approx. 45% of clients used the 30% tax credit to pay down the loan."

504.    It was misleading to assume that all consumers would receive the full federal tax credit and apply it to their loans, when, in reality, many could not do so or were not doing so.

505.    Power Home also trained salespeople to tell consumers they could spend the federal tax refund on motorcycles, debt, or vacations.

506.    For example, salespeople were trained to tell consumers that they could use the tax credit to "buy some farm equipment, to take the family on vacation, pay off a credit card? Cool, it's your money, you can do whatever you want with it. But if you choose not to apply it to the system costs, then that $253 will go up a little bit."

507.    GoodLeap also trained installers, including Power Home, to "have the consumer mentally spend ITC" (its acronym for the Investment Tax Credit) telling them to say things like, "What would you do with $10,000 extra dollars (go 3 layers deep here)? Yes, a vacation does sound amazing! You also mentioned your son is about to go off to college. I bet that would help a lot with tuition cost, etc. right? Great!"

508.    As shown above, the proposals reinforced this with language like "HOW WILL YOU USE YOUR INCENTIVE?"

509.    Having consumers "mentally spend" the tax credit on farm equipment, vacation, credit card debt, or college tuition, when, in fact, the prices and monthly loan payments shown to them assumed they would not spend the tax credit this way, deceived them.

**DD.    Leave-Behind Sales Materials Deceptively Claimed Savings**

510.    At the sales meeting, Power Home gave consumers a sales brochure or sales book.

511.    Sales brochures used in sales from 2017 through 2020 claimed solar purchasers could "sit back and enjoy the savings" and would "start saving from Day One with no money out of pocket."    And, as shown below, under the heading "Financing Your Solar Investment," claimed, "Your new, dramatically lower utility bill plus your solar payments will be less than your old electric bill and saving will accumulate quickly over the years."



512.    Messrs. Klink and Waller approved, ordered, and distributed these sales brochures for use by the thousands.

513.    Mosaic requested, received, and reviewed these brochures.

514.    A 2020 version of the sales brochure likewise implied that after going solar consumers could save stacks of money, as shown below:



515.    As with other marketing materials and messages, the brochures did not tell consumers about the risks of losses from loan-backed solar purchases.

**EE.    Salespeople Used Their Appearance of Expertise to Exaggerate Savings**

516.    Power Home trained salespeople to appear as experts.

517.    A training manual emphasized in bold, "In order to create trust they need to like you & Believe that you are an expert."

518.    A sales manual instructed salespeople to start with a "Walk Around Inspection," whose first goal is to "Establish that you are an expert." It described this step as "imperative," and "very important," and said, "Establish that you are an expert by asking pointed questions pertaining to potential problems such as shade trees, azimuth, panel locations, etc."

519.    Salespeople used their apparent expertise to exaggerate the value of the loan-backed solar purchase.

520.    Salespeople falsely told consumers the solar loan would not cost them more than their current average utility bill, even when proposals might project otherwise.

521.    Salespeople also told consumers that they would see specific or complete energy bill reductions such as "you most likely won't have a power bill," "this will put electricity back into the grid," "this will power your home 90% of the time," "solar would cover 80% of your power," or this will result in a "30% energy use reduction."

522.    For example, in March 2021, the Chief Sales Officer wrote to all sales managers and directors, "Hey Team. Joe is starting to get a lot of consumers coming through retentions that think they won't have a power bill once they go solar. Please make sure your team is educating the consumers properly on the remaining power bill they will have once they go solar."

523.    Salespeople also deceived consumers about the tax credit, making it seem more certain than it was or promising a check from the government, which it was not.

524.    Salespeople also told consumers they would have specific bill reductions, e.g., a "$200 decrease in your energy bill" or "this will lower your electric bill to below $50 a month" or

90

"this will lower your bills to almost nothing (you can even make money)" or this will save you $1,700 a year.

525.    Messrs. Waller and Klink were aware their salespeople had made false or misleading statements regarding energy or monetary savings from complaints, undercover local news exposes, lawsuits, undercover secret shoppers, and sales presentation recordings.

526.    Each Lender was aware of consumer complaints regarding sales deception, including complaints that salespeople had claimed greater reductions in energy usage and "savings" than even the sales proposals indicated.

527.    For example, from April to May 2022, GoodLeap reported to Power Home, including Messrs. Klink and Waller, that Power Home's 2020 loans had consumer complaint rates four times higher than other installers, that investors were asking about lawsuits relating to "production/fraud claims," and that GoodLeap's capital markets team (which sold loans to investors) wanted to fix the sales model due to investor pressure.

528.    Dividend also had repeated notice of sales deception complaints.

529.    In January 2022, Dividend placed Power Home on a "watch list," due in part to what its General Counsel called, "disproportionately high fraud and misrepresentation complaints and high overall complaint rate[.]"

530.    Four months later, Dividend forwarded Power Home fraud complaints, including an elderly Virginia consumer alleging a salesperson had promised her "no electricity bill," despite her sales proposal (which Dividend reviewed) estimating only a 37% utility bill reduction.

531.    Two month later, a Dividend manager discussed "another complaint" from Power Home that "has the same kind of thumbprint as the others we've been pushing back their way," in which the consumer reported "that they were guaranteed by their salesperson that they would not

have a power bill, but in reality are saving very little on their power bill despite the system working properly," which the manager attributed to "[i]mproper/misrepresented expectations set by PHS [Power Home] sales rep where they tell HO [homeowner] that power bills will disappear (in line with a lot of these PHS complaints)[.]"

532.    Then in September 2022, Dividend's General Counsel demanded Power Home repay $2,020,419 to Dividend for 27 consumers who complained of "fraud and/or misrepresentation."  He wrote in his email, "Over the course of the relationship with Pink Energy, [Power Home's new name] Dividend has received hundreds of complaints alleging, among other things, fraud, misrepresentation and/or deceptive acts or practices on the part of Pink Energy" at a greater rate than other installers.

533.    Dividend sent Power Home a spreadsheet evaluating these 27 complaints.  As shown in the excerpt below with complaints from six Virginia consumers, Dividend's spreadsheet contrasted the consumer's "Sales Proposal Offset" (e.g. 46%, 35%, 32%) to the salespeople exaggerated promises, "Promised/Expected Production" (e.g., 100%, 100%, 130%):

| Loan Amount | Sales Proposal Offset | Promised/Expected Production | Synopsis |
|---|---|---|---|
| $69,600.00 | 46% | 100% | ▆▆▆ was told that his system would offset a majority of his consumption. According to the sales proposal generated in Aurora by Power Home, the system can only offset 46%. Power Home agreed to a loan modification of ($28,417) which Dividend has already provided to ▆▆▆ Power Home has yet to remit payment to Dividend |
| $64,911.00 | 35% | 100% | ▆▆▆ was told by his sales representative that the system would offset a majority of his consumption. According to the sales proposal generated in Aurora by Power Home, the system will only be able to offset 35%. ▆▆▆ also states that a technician came out to fix the system and he would subsequently see a reduction in his Utility Bill. He has not seen any reduction. ▆▆▆ also states that Power Home promised to reimburse him for his utility bill for a full year, but then declined to do so. |
| $64,911.00 | 32% | 2500 kWhs/month / 130% | ▆▆▆ was told by his sales representative that his system would offset 130% of his consumption. According to the sales proposal generated in Aurora by Power Home, the system will only be able to offset 32%. ▆▆▆ has retained an attorney and they have issued Dividend a Cease & Desist order. |
| $71,575.00 | 56% | 100% | ▆▆▆ informed Dividend that his utility bills were still very high after panels were installed. The sales proposal generated in Aurora by Power Home shows a 56% offset of consumption. |
| $58,240.00 | 53% | 100% | ▆▆▆ states that his system is not producing what his sales representative promised it would. According to the sales propisal generated in Aurora by Power Home, ▆▆▆'s system can only offset 53% of his consumption. |
| $71,575.00 | 50% | 100% | ▆▆▆ was guaranteed by her Power Home sales representative that she would receive a $14,000 ITC. |

534.    And Dividend provided synopses, including this Virginia complaint: "[Consumer] states that his system is not producing what his sales representative promised it would.  According to the sales proposal generated in Aurora by Power Home, [Consumer]'s system can only offset 53% of his consumption."

535.    This spreadsheet showed Dividend knew consumers reported salespeople claiming greater savings and system performance than those "generated" by Aurora sales proposals.

536.    It also showed Dividend knew the Aurora sales proposals were providing and showing customers estimated solar and energy efficiency savings or "offsets"; Dividend had access to the Aurora proposal data and could compare it to what customers actually received; and Dividend knew this data was important to and material to the sale of systems and loans.

537.    In that September 2022 email, Dividend's counsel also sent Power Home nine affidavits from consumers on forms it drafted.  The forms had check boxes to "describe[] the fraudulent or deceptive activity": including boxes for "I was promised savings (e.g. little to no utility costs) if I purchased a solar system" and "I was told that my solar equipment would produce significantly more energy than it is actually producing" as shown in the following screenshot:

Please check the appropriate box or boxes below that describes the fraudulent or deceptive activity:

☒  I was promised savings (e.g., little to no utility costs) if I purchased a solar system
☒  I was told that my solar equipment would produce significantly more energy than it is actually produ
☐  I did not authorize a credit review
☐  I did not sign or authorize the execution of the Solar Loan Agreement
☒  Other (specify):  that I would get a tax refund of 14,767 to apply to the loan

538.    Dividend's "fraudulent or deceptive activity" check boxes showed it was on notice of and regularly received complaints like: "I was promised savings" or "I was told that my solar equipment would produce significantly more energy than it actually produced."

539.    Dividend had no practice of systematically providing loan relief to the hundreds of consumers complaining of fraud, misrepresentation, unfair, or deceptive practices.

540.    Even after January 2022, when Dividend began interventions to address widespread consumer deception complaints, Dividend continued issuing loans to Power Home consumers in Virginia from February to July 2022.

541.    In sum, Dividend was on notice that Power Home's salespeople were engaging in misrepresentations and fraud about the energy production, value, and savings consumers could expect from Power Home's products and Dividend's solar loans.

542.    Like Dividend, Mosaic, GoodLeap, Sunlight, Technology Credit Union, and Cross River Bank all received and were on notice of multiple consumer complaints that salespeople deceived them about the savings and value they could expect from solar loans and purchases.

**FF. Sub-Conclusion: Thousands of Virginians Were Systematically Deceived about the Value of Solar Purchases and Loans**

543.    Ultimately, Power Home's and the Lenders' advertising, marketing, and sales presentations deceived consumers about the value of their solar purchase and loan.

544.    Thousands of consumers bought systems that they thought would save them money, but, in reality, cost them more than they were paying before solar, and, currently, years after their purchase, continue to do so.

## V. FACTS PART II OF II: THE LENDERS' HIDDEN LOAN FEES DECEIVED CONSUMERS AND INCREASED PRICES

545.    Each Lender charged hidden loan fees on every consumer loan.

546.    Lenders names for these fees included "Program Fees" and "Dealer Fees."

547.    These loan fees increased prices.

548.    First, fees increased the cash price of solar purchases: Power Home charged consumers who paid cash a lower price than it charged to the Lenders' loan consumers.

549.    Second, consumers paid the lenders' fees and additional interest from those fees.

550.    Each Lender made consumers responsible for paying these fees by including the fee in the loan principal and deducting the fee from what it paid, funded, or disbursed to Power Home.

551.    Lenders used verbs like "deducted" (Mosaic) or "netted from" (Sunlight) to describe how they kept what Sunlight called an "attractive upfront fee" and a "substantial fee" on every loan they made, brokered, or arranged.

552.    For example, a November 9, 2018 agreement between Sunlight, Power Home, and third-party beneficiary Technology Credit Union, said Power Home "acknowledges and agrees" that Technology Credit Union's and Sunlight's fee would "be netted out of the funded loan amount" disbursed to Power Home.

553.    As GoodLeap explained in a December 5, 2018 analysis of what it called "Dealer Fees," regardless of whether it imposed a fee of 10%, 14%, 17.74%, or 22.5%, "All Scenarios Assume the Entire Dealer Fee IS Passed Along to the Home Owner in The Total Loan Amount" as shown in the screenshot below from that analysis:

| Net Amount Not Including Dealer Fees | | | | | |
|---|---|---|---|---|---|
| $ | 25,000.00 | | | | |

| Term | Rate | Dealer Fees | Total Loan | Month 1-18 Payment | Month 19+ Payment |
|---|---|---|---|---|---|
| 20 Year | 2.99% | 22.50% | $30,625 | $121.58 | $175.79 |
| 20 Year | 3.99% | 17.74% | $29,435 | $128.63 | $184.85 |
| 20 Year | 4.99% | 14.00% | $28,500 | $136.52 | $195.51 |
| 20 Year | 5.99% | 10.00% | $27,500 | $143.83 | $205.43 |

Highlighted Cells are Inputs. The numbers here are place holders. Please use your actual Dealer Fee %
All Scenarios Assume The Entire Dealer Fee IS Passed Along To The Home Owner In The Total Loan Amount

554.   Likewise, Mosaic and Mr. Klink repeatedly referred to "rolling" dealer fees into the "system price" or "purchase price."

555.   In May 2017, Mosaic wrote, "Even accounting for higher dealer fees and rolling those into a higher system price, the monthly payment to the consumer should be lower."

556.   In September 2019, Mr. Klink confirmed to Power Home's CFO that the "dealer fee is rolled into the price to the client" so Power Home would "save 100% of the dealer fee[.]"

557.   The Lenders' records confirm consumers – not Power Home – paid the loan fees.

558.   For example, Mosaic's loan portal in 2017 showed that it would retain a "Dealer Fee Deduction" from each consumer's "Loan Amount" and send Power Home a "Disbursed Amount." So consumers paid the "Milestone Amount" (including the Dealer Fee) while Power Home received only the "Disbursed Amount" (not including the Dealer Fee).



## Finance Tab in Portal

| LOAN AMOUNT | MILESTONE | DATE REACHED | MILESTONE AMOUNT | DEALER FEE DEDUCTION | DISBURSED AMOUNT | |
|---|---|---|---|---|---|---|
| $53,875.00 | Operational | 2017-05-19 | $5,387.50 | $0.00 | $5,387.50 | There are now 3 milestones for disbursements: |
| $30,361.00 | Installation | 2017-05-21 | $12,144.40 | $0.00 | $12,144.40 | 1. Equipment |
| $25,520.00 | Installation | 2017-05-19 | $10,208.00 | $0.00 | $10,208.00 | 2. Installation 3. Operational (PTO) |
| $42,282.00 | Installation | 2017-05-22 | $16,912.80 | $0.00 | $16,912.80 | |
| $13,600.00 | Equipment | 2017-05-22 | $6,800.00 | $2,176.00 | $4,624.00 | Dealer fee is deducted in full from M1 (equipment) |
| $13,600.00 | Installation | 2017-05-22 | $5,440.00 | $0.00 | $5,440.00 | |

MOSAIC                                                                   CONFIDENTIAL

96

559.    Likewise, GoodLeap's records show consumers paid its Program Fee.  In the below

example, its "Funding Ledger" shows a September 2020 consumer loan for which the "Total Loan

Amount" of $51,480 includes the $12,123.54 (23.5%) "Program Fee" plus the "Amount funded"



to Power Home of $39,356.46.  In other words, this consumer is to pay $51,480 (including the

Program Fee), while Power Home received only $39,536.46 (not including the Program Fee).

560.    Likewise, Dividend retained the Platform Fee from its disbursements.

561.    For example, on June 18, 2021, Dividend employees wrote that they paid Power

Home "net of PF disbursement" (meaning they deducted the Platform Fee from the disbursement)

in all states but Michigan.

562.    Power Home's records also show how consumers paid the loan fees.  This excerpt

from a June 2022 spreadsheet tracking Sunlight's, Technology Credit Union's, and Cross River

Bank's fees, illustrates that for every consumer there are entries for their "Loan Amount" (which

they paid); minus the "Dealer Fee %" and "Dealer Fee $" (which the lenders kept); resulting in the "Net Funding Requested" (the amount that Power Home received).

| Loan Amount | Dealer Fee % | Dealer Fee $ | Net Funding Requested |
|---|---|---|---|
| $50,920 | 13% | $6,619.60 | $44,300.40 |
| $82,499 | 15.50% | $12,787.35 | $69,711.66 |
| $70,000 | 17.75% | $12,425 | $57,575 |
| $39,615 | 13% | $5,149.95 | $34,465.05 |
| $39,615 | 13.75% | $5,447.06 | $34,167.94 |
| $59,615 | 13% | $7,749.95 | $51,865.05 |
| $91,499 | 15.50% | $14,182.35 | $77,316.66 |
| $16,800 | 14.25% | $2,394 | $14,406 |
| $62,115 | 13% | $8,074.95 | $54,040.05 |
| $59,615 | 13% | $7,749.95 | $51,865.05 |
| $63,232 | 13% | $8,220.16 | $55,011.84 |
| $39,615 | 13% | $5,149.95 | $34,465.05 |
| $70,000 | 13% | $9,100 | $60,900 |
| $67,499 | 15.50% | $10,462.35 | $57,036.66 |
| $46,512 | 13% | $6,046.56 | $40,465.44 |
| $73,420 | 13.75% | $10,095.25 | $63,324.75 |

563.    Put simply, the consumer paid the "loan fee," or "dealer fee", not Power Home; it was, in GoodLeap's words, "Passed Along to the Home Owner"; or in Mr. Klink's or Mosaic's words, "rolled" into the purchase price and loan amount.

**A.  Dividend's Hidden Fee**

564.    Dividend imposed a "Platform Fee" of 15.5% or 16% on Power Home loans.

565.    Dividend explicitly called its charge a "Platform Fee."

566.    These fees increased loan prices above the cash price.

567.    Dividend hid and omitted its Platform Fee from consumers in multiple ways.

568.    First, it hid and omitted the Platform Fee in consumers' sales proposals by folding the Fee into the "System Cost."

98

569.   Second, it hid and omitted the Platform Fee in its Truth in Lending Act Disclosures.

570.   For example, on or around April 6, 2022, a Cape Charles, Virginia consumer took out a 25-year Dividend loan for $59,740 that included a $9,259.70 (15.5%) Platform Fee.

571.   The Cape Charles consumer, as did all consumers, received Truth in Lending Act Disclosures from Dividend.

572.   The example below shows two portions of Dividend's Truth in Lending Act Disclosures to this consumer.  In red is how it should have disclosed its Platform Fee, contrasted with its actual disclosures:



573.   To hide its Platform Fee, Dividend misrepresented the "Amount Paid to Others on Your Behalf," claiming to send $59,499 to Power Home "for Collateral and Installation," when, in fact, Dividend would send $9,259.70 (15.5%) less.

574. Likewise, Dividend misrepresented the "Principal Amount of Loan" as the "sum of all payments" made to Power Home on the Borrower's behalf, when, in fact, it was not paying Power Home that amount.

575. As illustrated, hiding the $9,259.70 (15.5%) Platform Fee understated the Finance Charge and Annual Percentage Rate, overstated the Amount Financed, and overstated the "Principal Amount of the Loan" and the "Amount Paid to Others on Your Behalf" in the Itemization of Amount Financed.

576. In reality, both Power Home's and Dividend's records show that Dividend deducted or withheld its $9,259.70 (15.5%) Platform Fee from what it sent Power Home for the solar system equipment and installation.

577. Power Home's records show two disbursements from Dividend to Power Home, both of which withheld the Platform fee, as shown below:

| Disbursement Type | Release Date | M1 | M2 | Loan Amount | Milestone Amount (pre-fee) | Platform Fee% | Platform Fee($) | Disbursement Amount |
|---|---|---|---|---|---|---|---|---|
| Substantial Completion | 3/9/2022 | 35 | 65 | 59740 | 38831 | 15.5 | 6018.81 | 32812.19 |
| Work Order | 1/19/2022 | 35 | 65 | 59740 | 20909 | 15.5 | 3240.9 | 17668.1 |

578. Together these two disbursements withheld $9,259.70 ($6,018.81 + $3,240.90) in Platform Fees, disbursed $50,480.30 ($32,812.19 + $17,668.10) to Power Home, and made the consumer responsible for the loan amount of $59,740, including the fee.

100

579.    Dividend's records show the same two disbursements from Dividend to Power Home, both of which withheld the Platform Fee, as these excerpts show:

| Disbursement Type | Milestone Amount pre-fee | Disbursement Amount | DS Project: Loan ID: Lo | Total Fee | Created Date |
|---|---|---|---|---|---|
| Substantial Completion | $ 38,831.00 | $ 32,812.19 | DivLev25 | $ 6,018.81 | 3/9/2022 |

| Disbursement Type | Platform Fee Rate (%) (Loan) | Milestone Amount pre-fee | Disbursement Amount | Release Date |
|---|---|---|---|---|
| Work Order | 15.5 | 20909 | 17668.1 | 1/19/2022 |

580.    Together these two disbursements withheld $9,259.70 ($6,018.81 + $3,240.90) in Platform Fees and disbursed $50,480.30 ($32,812.19 + $17,668.10) to Power Home.

581.    Ultimately, this consumer must pay the full "Loan Amount" of $59,740, including the "Total Fee" of $9,259.70.

582.    These misrepresentations of the "Finance Charge," "Amount Financed," "Itemization of the Amount Financed," "Amount paid to others on your behalf," and the "Annual Percentage Rate," recurred in all Truth in Lending Disclosure Statements and loan agreements used by Dividend for Power Home loans.

583.    Third, Dividend and Power Home agreed to hide and omit the Platform Fees in Power Home's purchase agreements.

584.    For example, the following purchase agreement for the Cape Charles consumer discussed above falsely claimed $59,740 as the cost of the "Product(s)/Services" and as the "Total Contract Price," when, in fact, the cost of these products and services was only $50,480.30.

| Qty | Product(s)/Service(s) |
|---|---|
| *Solar Energy System* | |
| 14 | 400w - HANWHA Q CELLS |
| | |
| | |
| *Battery Backup (only complete if applicable & Back-Up Battery Addendum **Must** be Attached)* | |
| 1 - $21,500 | Generac battery cabinet (contains three (3) 3.0 kWh modules) |
| 0 | Generac (3.0 kWh) (*each* additional module) |
| | |
| *Other* | |
| | |
| | |
| | Subtotal | $ 59740 |
| | Taxes | $ |
| | Total Contract Price* | $59740 |

\* This amount does <u>not</u> include Federal, state, local, utility or third-party tax credits, incentives or rebates (if any) or Company rebates (if any). Customer should consult its own independent tax or financial advisor regarding the foregoing.

585.    Finally, Dividend's Loan and Security Agreements misrepresented that "proceeds from the Loan will solely be used to pay for the design and installation of solar photovoltaic (PV) electricity generation, energy storage, and/or related equipment or improvements (the 'Collateral') at the Home," when, in fact, loan proceeds were also used to pay the Platform Fee.

**B.  GoodLeap's Hidden Fee.**

586.    GoodLeap imposed a "Program Fee" on its Power Home loans.

587.    GoodLeap explicitly called its charge a "Program Fee" in its own records.

588.    It withheld the Program Fee from the loan funds it disbursed to Power Home Solar.

589.    Its Program Fee amount increased over time, from 9% in 2018 to over 22% in 2022.

590.    These fees increased loan prices above the cash price.

591.    It hid its Program Fee from consumers in multiple ways.

592.    First, it hid and omitted the Program Fee from consumers' sales proposals.

593.    For example, around December 4, 2018, a Rockingham, Virginia consumer took out a 20-year GoodLeap loan for $26,077.50 that included a 10% Program Fee of $2,607.80.  The proposal shown to the consumer omitted this fee, including in the "Cost" section shown below:



594.    The proposal also omitted the fee when showing the "Loan Amount" and "Net System Cost" as shown in this screenshot:



595.    Second, GoodLeap hid and omitted the Program Fee from its Truth in Lending Disclosure Statement.

596.    For example, these are redacted portions of the Truth in Lending Disclosure Statement GoodLeap provided around May 21, 2021 to a Hampton, Virginia consumer for a

$49,951 loan with a $11,483.74 (22.9%) Program Fee. They show in red how GoodLeap should have disclosed the fee, contrasted with what it actually disclosed:



597.    As shown, misrepresenting the $11,483.74 (22.9%) Program Fee understated the Finance Charge and Annual Percentage Rate, overstated the Amount Financed, and misrepresented the "Amount paid to others on your behalf" in the Itemization of Amount Financed by overstating what GoodLeap actually paid Power Home on the consumer's behalf.

598.    When GoodLeap actually sent funds to Power Home for this consumer's solar system, it deducted or withheld from the "Funds Sent" the $11,483.74 (22.9%) Dealer Fee / Program Fee as shown in this redacted excerpt from Power Home's records.

| City | State | Zip | Total Loan Amount | Loan Type | Loan Term | Sales Rep | % Loan Funded | Funds Sent | Dealer Fee% | Dealer Fee $ |
|------|-------|-----|-------------------|-----------|-----------|-----------|---------------|------------|-------------|--------------|
| HAMPTON | VA | ████ | $49,951.00 | 2.99 | 25 | ████ | 100 | $38,467.27 | 22.99 | $11,483.74 |

599.    That GoodLeap ultimately sent Power Home only $38,467 and not $49,951 confirms that its Disclosure Statement for this consumer (and others) misrepresented the "Amount paid to others on your behalf," the "Finance Charge," "Amount Financed," and the "Annual Percentage Rate."

600.    Ultimately, this consumer must pay the full "Total Loan Amount" of $49,951, including the "Total Fee" of $11,483.74.

601.    Third, GoodLeap and Power Home agreed to hide and omit the Program Fees in Power Home's purchase agreements.

602.    For example, as shown in the screenshot below, a purchase agreement for the May 2021 loan to the Hampton, Virginia consumer showed "$49951" as the "Total Contract Price," which it defined as "the materials and labor provided by Contractor," and "materials, labor, and tax" as shown in the screenshot below:



603.    This and other Purchase Agreements did not tell the consumer that a substantial amount of the "Total Contract Price" – $11,483 out of $49,951 in this example – came from loan fees and was not for "materials and labor provided by the Contractor."

604.    The language in the Purchase Agreements was agreed upon by Power Home and GoodLeap, which regularly and continually reviewed Power Home's Purchase Agreements, occasionally requiring Power Home to agree to GoodLeap's proposed revisions.

605.    Fourth, GoodLeap hid and omitted Program Fees from its own loan agreements.

606.    For example, a July 27, 2020 GoodLeap loan agreement with a Virginia Beach, Virginia consumer, contained the following "Fee" section that omitted the 23.5% Program Fee it charged the consumer, mentioning only smaller $200 or $300 fees like a "Transfer Fee":

> **4.   FEES.** We will also charge you the following fees to the extent permitted by applicable law.
>
> a.   <u>Insufficient Funds Fee</u>. Unless prohibited by law, you will be charged a non-refundable fee of $15 for each failed el... bank may assess its own fee in addition to the fee we assess.
>
> b.   <u>Fee for the Removal and Refiling of Our County Fixture Filing</u>.  See Section 6 below for further information.
>
> c.   <u>Transfer Fee</u>. See Section 6 below for further information.
>
> d.   <u>Alternative Payment Convenience Fee</u>.  Where permitted by law, if you request that we accept a payment via an alte... be charged a convenience fee, in an amount that we will disclose prior to your election to pay by such alternative me...

## C.  Mosaic's Hidden Fee

607.    Mosaic imposed a "Dealer Fee" on Power Home loans it made, arranged, or brokered.  The fee typically ranged from 7.5% to 10%.

608.    These fees increased loan prices above the cash price.

609.    It hid its fee from consumers in multiple ways.

610.    First, it hid and omitted these fees in loan application materials.

611.    For example, Mosaic sent loan approval emails that listed the loan terms and rates that the consumer had been approved for, but which omitted its dealer fees.

612.    Second, it hid and omitted the fee in consumers' sales proposals as in the example in section V.B.

613.    Third, it hid and omitted its fee in its own Truth in Lending Disclosure Statements and in Disclosure Statements and in similar statements it provided to consumers for loans it brokered and arranged.

614.    For example, on March 19, 2018, a Henrico, Virginia consumer took out a 20-year Mosaic-brokered or arranged loan funded by Digital Federal Credit Union in the amount of $29,913.  The loan included a $2,841.73 (9.5%) Dealer Fee.

615.    The excerpts from the Truth in Lending Disclosure statement that Mosaic generated for the credit union show in red what should have been disclosed, contrasted with what it actually disclosed:



616.    As illustrated, hiding the $2,841.73 (9.5%) Dealer Fee understated the Finance Charge and Annual Percentage Rate, overstated the Amount Financed, and misrepresented the

"Amount Financed / Amount Due to Power Home Solar" in the Itemization of Amount Financed by overstating what Mosaic or Digital Credit Union actually paid Power Home on the consumer's behalf.

617.    Each Mosaic consumer also received a "Loan Summary." As shown below for the Henrico consumer discussed above, the Loan Summary claims $29,913 as the "Purchased Goods Loan Amount" and shows three disbursements, $14,956 for "Equipment Received Disbursement," $11,965.20, and $2,991.30.  All four of those numbers were false.

| LOAN SUMMARY | | | | |
|---|---|---|---|---|
| Term: | **20 Years** | | Purchased Goods Loan Amount | **$29,913.00** | Section 2 |
| Number of Monthly Payments(est.): | **238** | | Operations and Maintenance | | |
| Loan Start Date(est.): | 05/03/2018 | Section 1 | Loan Amount: | | Section 2 |
| First Payment Date(est.): | 08/03/2018 | Section 3 | Total Loan Amount: | **$29,913.00** | Section 2 |
| Recurring Payment Day(est.): | **Day 3 of Month** | Section 3 | Loan Disbursement Schedule: | | Section 5 |
| Maturity Date(est.): | 05/03/2038 | Section 3 | Equipment Received Disbursement: | **$14,956.50** | |
| | | | Install Complete Disbursement: | **$11,965.20** | |
| | | | Final Loan Disbursement: | **$2,991.30** | |

618.    In reality, when Mosaic disbursed funds for this Henrico consumer's project, it deducted its 9.5% dealer fee from each disbursement, as shown in this excerpt from Power Home's records showing three "Dealer Fee Deductions," totaling $2,841.74.

| Loan Amount | Disbursement Date | Milestone Amount | Dealer Fee Deduction | Disbursed Amount |
|---|---|---|---|---|
| $29,913.00 | 7/24/2018 | $14,956.50 | $1,420.87 | $13,535.63 |
| $29,913.00 | 7/24/2018 | $11,965.20 | $1,136.69 | $10,828.51 |
| $29,913.00 | 11/2/2018 | $2,991.30 | $284.18 | $2,707.12 |

619.    That Mosaic ultimately sent Power Home less than the loan amount confirms its Disclosure Statement for this consumer (and all others) misrepresented the "Amount paid to others on your behalf" as well as the "Finance Charge," the "Amount Financed," and the "Annual Percentage Rate" and falsified its "Loan Summary" including its Loan Disbursement amounts.

620.    Ultimately, this consumer must pay the full "Loan Amount" of $29,913, including the $2,841.74 "Dealer Fee."

**D.  Sunlight and Cross River Bank's Hidden Fee**

621.    Sunlight imposed a "Loan Origination Fee" or an "Original Issue Discount" or "OID" on the Power Home loans it brokered or arranged for Cross River Bank, Technology Credit Union, and other loan funders.

622.    This illustration from a 2021 Sunlight investor presentation explains how this model worked to allow Sunlight to earn "substantial" fees that consumers had to repay to Cross River Bank, Technology Credit Union, and other "Capital Providers".



623.    As illustrated, Sunlight was a middleman, a broker.  It made money by brokering loans from the "Capital Provider" to contractors like Power Home, pocketing a "substantial fee" and an "attractive upfront fee" for its services.

624.    Sunlight also brokered the loans between the consumer and Capital Providers like Cross River Bank and Technology Credit Union.  As illustrated, the consumer must repay the Capital Provider the "interest and principal on loan balance."  This loan balance included Sunlight's "substantial fee."

625.    In agreements, Sunlight and Cross River Bank described this fee as a "Loan Origination Fee" or an "Original Issue Discount" or "OID" on its Power Home loans.

626.    This fee was paid by consumer borrowers.  Cross River Bank's Program Agreement with Sunlight expressly defined it as an origination fee charged to borrowers: "with respect to each Loan, the up-front origination fee, if any, charged to the related Borrower for such Loan in an amount equal to the product of the Loan Origination Fee Rate for such Loan and the principal amount of such Loan."

627.    Sunlight and Cross River also agreed to split the fee, with Cross River setting a minimum amount and Sunlight getting any amount above that; as they explained in an agreement, "For example, if the Credit Union is requiring a 5% OID for the Loans, and Sunlight makes the Program available at a 12% OID to the Installers, then Sunlight shall be paid by Credit Union as part of the Loan funding and may retain for itself therefrom the amount of the 7% OID differential."

628.    In practice, Sunlight's and Cross River Bank's origination fees for Power Home consumers averaged 17.2%.

629.    These fees increased loan prices above the cash price.

110

630.    Cross River Bank and Sunlight hid and omitted their fees from consumers' sales proposals as shown in the example in section V.B.

631.    Cross River Bank and Sunlight also hid and omitted their fee in their Truth in Lending Disclosure Statements, which were transmitted through Sunlight's digital platform along with loan applications and loan documents.

632.    Consumers would receive two Disclosure Statements, one from Sunlight by email, and another in their loan agreements with Cross River Bank.  Each were essentially identical.

633.    For example, on August 1, 2022 a Troutville consumer took out a 25-year $50,000 loan funded by Cross River Bank and brokered and arranged by Sunlight.

634.    The excerpts below show in red how Cross River Bank and Sunlight should have disclosed their $8,875 (17.75%) fee, contrasted with what they actually disclosed in their Truth in Lending Act Disclosures:



635.    Both Power Home's and Cross River Bank's records show that when Cross River Bank actually sent funds to Power Home (through Sunlight) for this consumer's solar system, it only paid $41,125, deducting its $8,875 (17.75%) fee.

636.    These are excerpts from Power Home's records for this transaction showing two funding payments at two different "Milestones," each of which deducted the "Dealer Fee." Ultimately, the consumer has to pay the "Loan Amount" of $50,000, including the "Total Dealer Fees" of $8,875, while Cross River disbursed only $41,125 to Power Home, withholding or deducting the $8,875 ($4,438 + $4,437.50) in Dealer Fees.



| Payment Date | Milestone Amount | Milestone Dealer Fee | Disbursement Amount |
|---|---|---|---|
| 8/2/2022 | $25,000 | $4,438 | $20,562.50 |
| 8/18/2022 | $25,000 | $4,437.50 | $20,562.50 |
| | | | **$41,125.00** |

637.    Cross River Bank's loan records show the same transaction: the consumer owing $50,000, Power Home receiving two disbursements of $20,562.50, and Cross River Bank withholding or deducting $8,875 (17.5%) from the amount it paid Power Home.

638.    The withheld $8,875 would then be split between Sunlight and Cross River Bank.

639.    That Cross River Bank and Sunlight ultimately sent Power Home only $41,125 and not $50,000 confirms that their Disclosure Statement for this consumer (and all others) misrepresented the "Gross Amount Due to Contractor for System" as well as the "Finance Charge," "Amount Financed," and the "Annual Percentage Rate."

640.    Cross River Bank and Sunlight also allowed Power Home to hide and omit their fees in Power Home's purchase agreements as the other lender did as in the examples shown in sections V.A. and V.B.

641.    Cross River Bank and Sunlight also hid and omitted their fees in their "Summary of Key Loan Terms" and loan agreements, including claiming the full loan amount would be used for the price of the solar system and understating the annual percentage rate.

**E. Sunlight and Technology Credit Union's Hidden Fee**

642.    As with Cross River Bank, Sunlight and Technology Credit Union imposed an "Original Issue Discount" fee on its Power Home loans.

643.    Their fee averaged 11.9%.

644.    Their fees increased Power Home's financed purchase prices above the cash price.

645.    They hid and omitted its fee from consumer's sales proposals in the same manner as the examples shown in section V.B.

646.    They also hid and omitted their fees in their Truth in Lending Disclosure Statements.

647.    As with Cross River Bank, Technology Credit Union's loan applications and loan documents, including Disclosure Statements, were transmitted through Sunlight's digital platform.

648.    Customers would receive two such Disclosure Statements, one from Sunlight by email, another in their loan agreements with the credit union.  Each were essentially identical.

649.    For example, on September 28, 2020, Locust Grove, Virginia consumers took out a 25-year Technology Credit Union loan (arranged and brokered by Sunlight) for $53,256 that included a $7,721.94 (15%) fee.  The images below show in red how they should have disclosed the fee, contrasted with what they actually disclosed:



650.    As shown, by hiding their $7,721.94 (15%) fee, Sunlight and Technology Credit Union understated the Finance Charge and Annual Percentage Rate, overstated the Amount Financed, and misrepresented the "Gross Amount Due to Contractor for Solar System" in the Itemization of Amount Financed by overstating what they actually paid Power Home.

651.    They also allowed Power Home to hide and omit their fees in Power Home's purchase agreements, as shown in the examples in sections V.A. and V.B.

652.    They also hid and omitted their fees in their "Summary of Key Loan Terms" that they emailed to consumers.

653.    Finally, Technology Credit Union omitted these fees from its own Loan Agreement's fee section, which mentioned only late fees and insufficient funds fees.

## F. Each Loan Agreement Subjects Loan Holders to Any Claims or Defenses Consumers Had Against Power Home

654.    Each consumer loan agreement entered into by Dividend, GoodLeap, Mosaic, Cross River Bank, and Technology Credit Union and each loan agreement arranged or brokered by Mosaic and Sunlight contained legally required language making loan holders subject to any claims and defenses consumers had against Power Home.

655.    Also known as the "Holder Rule," this language provides:

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

## VI. COUNTS

### Count I: Deception about Value, Savings, Costs, and Risk in Violation of the federal Consumer Financial Protection Act, 12 U.S.C. § 5531(a)

### (Against All Defendants)

656.    Plaintiff realleges paragraphs 1-655.

## A.  Relevant Law

657.    The Attorney General of any state has authority to enforce the federal Consumer Financial Protection Act. 12 U.S.C. § 5552(a)-(b).

658.    That Act provides in part: "It shall be unlawful for – (1) any covered person or service provider . . . (B) to engage in any unfair, deceptive, or abusive act or practice[.]" 12 U.S.C. § 5536(a)(1)(B).

659.    A "covered person" is "any person that engages in offering or providing a consumer financial product or service."  12 U.S.C. § 5481(6).

660.    A "covered person" may include sellers of "nonfinancial goods or services," ("merchants") when "such person is engaged in offering or providing any consumer financial product or service."  12 U.S.C. § 5517(a)(1).

661.    A "covered person" includes "related persons," meaning "(i) any director, officer, or employee charged with managerial responsibility for" a "covered person" or (ii) "any shareholder, consultant, joint venture partner, or other person, as determined by the Bureau (by

rule or on a case-by-case basis) who materially participates in the conduct of the affairs of such covered person." 12 U.S.C. § 5481(25)(B), (C)(i)-(ii).

662.    A "service provider" is "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that (i) participates in designing, operating, or maintaining the consumer financial product or service; or (ii) processes transactions relating to the consumer financial product or service," with exceptions for data processors, ministerial support services, and media providing advertising time or space.  12 U.S.C. § 5481(26).

663.    A "consumer financial product or service" means "any financial product or service described in [12 U.S.C. § 5481] paragraph 15 and is offered or provided for use by consumers primarily for personal, family, or household purposes . . . ."  Paragraph 15 of the statute includes subdivision (i) ("extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit,") and subdivision (x) ("collecting debt related to any consumer financial product or service").  12 U.S.C. § 5481(5).

**B.  Each Defendant is Subject to the Act as a Covered Person or Service Provider Engaged in Offering a Consumer Financial Product**

664.    Solar loans are a consumer financial product or service because they are offered to and provided to consumers to purchase residential solar products (panels, inverters, batteries) and services (installation and repair) primarily for consumers' personal, family, or household purposes, as alleged in section IV.A.

665.    Each Lender is a "covered person" under 12 U.S.C. §§ 5481(6) and 5536(a)(1)(B) because they engaged in offering and providing solar loans, a consumer financial product.

666.    Cross River Bank is a "covered person" because from approximately May 2019 to August 2022 it extended consumer credit, entering into over 200 loan agreements and promissory notes with Virginians for purchases of Power Home's solar systems.  These loans were all brokered or arranged by Sunlight.

667.    Dividend is a "covered person" because it extended consumer credit, serviced consumer loans, sold consumer loans, and collected consumer loan debt.  It extended credit from approximately June 2021 to July 2022, entering into over 300 loan agreements and promissory notes with Virginians for purchases of Power Home's solar systems and by selling many of those loans to third party investors.  It also serviced and collected debt for those loans.

668.    GoodLeap is a "covered person" because it extended consumer credit, serviced consumer loans, sold consumer loans, and collected consumer loan debt.  It extended credit from approximately March 2018 to September 2022, entering into over 1,000 loan and security agreements with Virginians for purchases of Power Home's solar systems and by selling many of those loans to third party investors.  It also serviced and collected debt for those loans.

669.    Mosaic is a "covered person" because it extended consumer credit, serviced consumer loans, and collected consumer loan debt.  It extended credit from approximately September 2017 to June 2021, entering into over 500 loan agreements with Virginians for purchases of Power Home's solar systems.  It also extended credit by selling some of the consumer loans it entered into and by arranging or brokering over 700 loans to Virginians for purchases of Power Home's solar systems that were funded by other lenders.  It also serviced and collected debt for those loans.

117

670.    Mosaic is also a "service provider," because it participated in designing, operating, and servicing the consumer loans funded by other lenders, including processing loan payments, handling complaints, and pursuing delinquent payments.

671.    Sunlight is a "covered person" because it extended consumer credit, serviced consumer loans, and collected consumer loan debt.  It extended credit from approximately November 2018 to September 2022 by brokering or arranging over 900 loans to Virginians for purchases of Power Home's solar systems that were funded by other lenders, including the 200-plus loans funded by Cross River Bank and the 600-plus loans funded by Technology Credit Union, and by servicing and collecting debt arising from the loans it brokered or arranged.

672.    Sunlight is also a "service provider," because it participated in designing, operating, and servicing the Virginia loans funded by Technology Credit Union, Cross River Bank, and other lenders, including processing loan payments, handling complaints, and pursuing delinquent payments.

673.    Technology Credit Union is a "covered person" because from February 2019 to July 2022, it extended consumer credit, entering into over 600 long-term loan agreements and promissory notes with Virginians for purchases of Power Home's solar systems.

674.    Power Home was a "covered person" because it was a merchant engaged in offering, providing, or brokering loans from the Lenders, though it did not directly extend credit itself.  As alleged in section IV.A, most of its sales from 2017 until 2020 and over 90% of its sales from 2020 through 2022 involved purchase loans.

675.    Messrs. Waller and Mr. Klink are "related persons" of Power Home because they were directors and officers charged with managerial responsibility for Power Home, a covered

118

person. They were also shareholders and owners of Power Home who materially participated in the conduct of its affairs, including the deceptive acts or practices alleged here.

### C. Advertising, Marketing, and Sales Practices Deceived Consumers about the Value, Savings, Costs, and Risks of Solar Purchases and Solar Loans.

676. From January 1, 2017 until Power Home's October 1, 2022 bankruptcy, Defendants engaged in deceptive acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B) to sell Power Home's solar systems and the Lenders' loans as detailed in the Facts section and summarized here.

677. Defendants knew the loan-backed solar systems sold here were risky purchases: with higher-than-average prices, fees, battery sales rates, and loan amounts, many consumers would lose money initially, for years to come, or for the entire loan term, as described in sections IV.D-F and V-W.

678. Deception began with advertising, which, at all times from 2017 to October 2022 generated thousands of consumer responses by claiming consumers could pay nothing out of pocket or no money down, could save thousands of dollars, could reduce their bills, or could qualify for tax credits, while omitting or obscuring that consumers would take on loans, debt, or risk, as described in section IV.I and K.

679. Next a website and landing pages, which, at all times from 2017 to October 2022, emphasized savings and lack of costs without disclosing actual costs or that consumers would be taking on loans, debt, or risks, as described in section IV.J.

680. Then, at all times from 2017 to October 2022, a call center told consumers that solar would cost them nothing out of pocket or nothing more than their current utility bill, touted savings from solar purchases, and implied consumers would receive the federal tax credit based on their

income, all while avoiding disclosing the "numbers, specifics, or details," of loans, debt, or risks as described in section IV.N.

681.    After calls, scheduling texts reiterated that consumers would "save thousands," and "save on their electric bill," as described in section IV.P.

682.    The sales pitch escalated and inflated purchase's estimated savings over time (and the "pain" from current utility bills) using inaccurate past utility data as described in sections IV.T-U.

683.    From 2017 until mid-February 2021, the sales pitch touted long-term 25- and 30-year savings with precise numbers in large fonts in multiple places in proposals, reinforced by graphs and narrative, relying on faulty assumptions about function, performance, and inflation, to convince consumers that solar was a good value (and to obscure initial and yearly losses) as described in section IV.V.

684.    In addition, from May 2017 to October 2019, sales pitches further increased the 25-year "savings" estimates by adding 4.1% of the home's value as "Instant Equity from Going Solar," when, in fact, consumers taking out solar loans lost rather than gained equity as described in section IV.V.

685.    From February 2021 to October 2022, with higher prices making long-term comparisons less feasible, the sales pitch focused on misrepresenting the consumers' "savings" on utility bills without properly accounting for post-solar loan bills – or, as GoodLeap described it, without properly accounting for the "true" or "actual" savings, cost, or value – as described in section IV.W.

686.    At all times from 2017 to October 2022, the sales pitch also claimed energy efficiency products would reduce consumption by up to 25-30% even though products often were

not needed, installed, or properly installed; products' efficacy varied between homes; and products were not shown, in fact, to be achieving these savings for consumers, as described in section IV.X.

687. At all times from 2017 to October 2022, the sales pitch also claimed or assumed that the solar systems purchased would start working immediately and continuously function for 25 to 30 years, when, in fact, installations were behind schedule, payments started before systems were connected, and systems had problems initially and periodically, making these energy production estimates inaccurate as described in section IV.AA.

688. At all times from 2017 to October 2022, salespeople delayed revealing loan prices until the end of the hours-long sales pitch, rushed consumers through price and financing information, and falsely claimed "our average person pays this [25-year loan] off between 6 to 8 years" as described in section IV.BB.

689. At all times from 2017 to October 2022, when displaying and discussing loan costs, salespeople and sales proposals deducted the federal tax credit to assume and imply to consumers they would receive the credit and to downplay the loan amount, when, in fact, as Defendants knew or should have known, few consumers were receiving and applying the tax credit to their loans, as described in section IV.CC.

690. From 2017 through 2020, at the sales meeting, salespeople would leave behind brochures and materials falsely claiming consumers could start saving on Day One, and "[y]our new, dramatically lower utility bill plus your solar payments will be less than your old electric bill and saving will accumulate quickly over the years" as described in section IV.DD.

691. At all times from 2017 to October 2022, Power Home's salespeople used their appearance of expertise to reinforce and, in some cases, go beyond, the standard sales message by telling consumers exaggerated savings claims, as described in section IV.EE.

121

692.    From 2017 through 2019, if consumers tried to cancel, they would receive emails falsely claiming that if they changed their mind, they would save "money from day one," solar purchases would "put money in your pocket" every year, and they would save money compared to their current bills as described in section IV.C.

693.    Ultimately, the advertising, marketing, and sales "engine" used to sell solar systems and solar loans deceived thousands of Virginians about material facts: the value, savings, and costs of, and risks of loss from, those purchases and loans.  These deceptions affected and harmed consumers, obscuring what all the Defendants knew well: consumers faced initial, yearly, and often long-term losses from loan-backed solar purchases.

694.    Each Defendant engaged in these deceptive practices and is liable.

**D.  Dividend's Liability**

695.    Dividend engaged in deception in violation of 12 U.S.C. § 5536(a)(1)(B) by authorizing, adopting, and ratifying the deceptive marketing, promotion, advertising, and sale of its loans.

696.    Dividend delegated to Power Home the advertising, marketing, promotion, and sale of its loans, subject to its control, as alleged in sections IV.B, L, O, Q, S, and T.  This included delegating responsibility for credit applications, loan applications, discussion (if any) of loan terms and loan disclosures, and loan agreement execution as described in sections IV.B and Q.

697.    Dividend generally avoided directly communicating with consumers until after they signed their loan agreements.  In the few cases when it conducted "Welcome Calls" – less than "2% of all deals" in its words – it did so with Power Home's salespeople in the room as described in section IV.B.

698.    Dividend knew the advertising, marketing, and sales pitch used to sell its loans; repeatedly and regularly met with Power Home's sales managers, sales trainers, and sales staff; and reviewed both Power Home's sales pitch and its process for conducting Dividend's credit application, loan application, and loan execution as described in sections IV.L, O, Q, and S-T.

699.    In 2021 it also obtained and reviewed Power Home's sales proposals and written and video recorded sales training materials for those proposals – including the types of proposals described and shown in sections IV.S, T, W, X, and CC – then worked with Power Home and sales proposal companies to integrate Dividend's credit application, loan application, and loan documents into the sales proposal as described in section IV.S.

700.    Dividend knew the advertising, marketing, and sales pitch had to sell what it called "incredibly high" priced systems and loans (at prices that exceeded Dividend's "standard rail guards") to value-focused consumers, as described in sections IV.D-F.

701.    The sales proposals and training videos Dividend obtained in 2021 showed how Power Home was deceptively selling money-losing systems and loans to consumers including the deceptive comparisons described in section IV.W, the energy efficiency product savings claims described in section IV.X-Z, the solar production savings claims described in section IV.AA, and the loan cost and tax credit claims described in sections IV.BB-CC.

702.    Dividend also knew by at least January 2022 that salespeople misrepresented the performance of and savings from loan-backed solar purchases as described in section IV.EE.

703.    As a result, Dividend's delegation encompassed the deceptive advertising, marketing, and sales practices that occurred during the June 2021 to October 2022 period it made loans to Virginians to purchase Power Home's systems.

704.    Dividend was on notice from consumer complaints and its own evaluation of consumer complaints that consumers were not receiving the value, savings, offset, energy efficiency savings, or energy production estimated from their sales proposals or that the salespeople claimed as described in sections IV.Z and EE.

705.    Dividend accepted over 300 loan agreements and promissory notes with Virginians for purchases of Power Home's solar systems from May 2021 through July 2022 obtained through these deceptive acts and practices.

706.    Dividend did not reject loan agreements with consumers despite its awareness of the deceptive practices underlying the agreements as alleged in section IV.EE.

707.    Dividend is liable for these deceptive acts or practices because it engaged in them.

708.    Dividend is also liable under agency law for any deceptive acts or practices conducted by Power Home with respect to Dividend loans because it granted actual agency to Power Home to engage in those acts or practices.

709.    An actual agency relationship is one wherein the principal authorizes the agent to act for the principal's benefit but, at the same time, retains the right to control the agent's conduct. When determining whether an actual agency relationship exists, courts should examine the conduct of, and relationship between, the parties involved. *See, e.g., Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659-60 (4th Cir. 2019).

710.    Dividend authorized Power Home to engage in advertising, marketing, and sales, subject to its control; it trained salespeople; it obtained and reviewed sales training materials and proposals; it integrated its loan platform into sales proposals; and it controlled pricing, including permitting and encouraging Power Home to exceed its usual price limits, all of which led to the consumer deception and harm alleged here.

711.    Dividend is also liable under agency law because it ratified Power Home's deceptive advertising, marketing, and sales practices.

712.    "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Hodgin v. UTC Fire*, 885 F.3d 243, 252 (4th Cir. 2018) (*citing* Restatement (Third) of Agency § 4.01(1) (2006)). A party "may ratify an act by failing to object to it or to repudiate it," or by "receiving or retaining [the] benefits it generates." Restatement (Third) of Agency § 4.01 cmts. f-g (2006).

713.    Dividend ratified Power Home's advertising, marketing, and sales practices because it received, retained, and did not repudiate the benefits of those practices when it accepted and enforced its Virginia loan agreements. It knew the material facts of how those agreements were advertised, marketed, and sold from the sales presentations and proposals it reviewed and from – by its own General Counsel's admission – "hundreds of complaints, alleging, among other things, fraud, misrepresentation and/or deceptive acts or practices on the part of Pink Energy [Power Home]." It even compiled affidavits from consumers who were "promised savings (e.g. little to no utility costs)" and were "told my solar equipment would produce significantly more energy than it is actually producing."

714.    As described in section V.F, the Holder Rule also makes Dividend liable to consumers for the seller's deceptive practice for loans it holds.

**E.  GoodLeap's Liability**

715.    GoodLeap engaged in deception in violation of 12 U.S.C. § 5536(a)(1)(B) by authorizing, adopting, and ratifying the deceptive marketing, promotion, advertising, and sale of its loans.

716.    Starting in 2018, GoodLeap delegated to Power Home the advertising, marketing, promotion, and sale of its loans, subject to its control, as described in sections IV.B, L, O, Q, S, and T.

717.    GoodLeap delegated to Power Home salespeople responsibility for credit applications, loan applications, discussion (if any) of loan terms and loan disclosures, and loan agreement execution, subject to its control, and avoided direct communication with consumers until after the consumer's statutory right-to-cancel period had expired as described in sections IV.B and Q.

718.    GoodLeap knew the advertising, marketing, and sales pitch used to sell its loans; met repeatedly and regularly with Power Home's sales managers, sales trainers, and sales staff; and reviewed both Power Home's sales pitch and its process for conducting GoodLeap's credit application, loan application, and loan execution as described in sections IV.L, O, Q, and S-T.

719.    From 2018 through 2022, GoodLeap regularly obtained and reviewed Power Home's sales proposals, as described in sections IV.B, D, and R-W.

720.    From 2018 through 2022, GoodLeap worked with Power Home and sales proposal companies to integrate GoodLeap's credit application, loan application, and loan documents into Power Home's sales proposal as described in section IV.S.

721.    GoodLeap knew Power Home's above market prices, battery sales, and its own loan fees increased each consumer's loan amount and the risk that they would not save money for years; this was borne out in its June 2022 audit, which revealed that consumers audited risked losing tens of thousands of dollars over the length of its 25 year loans as described in sections IV.D and W.

722.    The sales materials GoodLeap obtained and reviewed showed every step of the sales pitch and proposal during the time it extended consumer loans, including the deceptive acts and practices described in sections IV.S-CC.

723.    Moreover, GoodLeap repeatedly identified sales proposal content that deceived consumers about the value of the solar purchase and its loans, including the use of inaccurate utility rate escalators from 2018 until February 2021 as described in section IV.U and the misrepresentation of "savings" from 2021 to 2022 as described in section IV.W.

724.    GoodLeap also knew salespeople misrepresented the performance of and savings from loan-backed solar purchases as described in section IV.EE.

725.    GoodLeap was on notice from consumer complaints, news reports, lawsuits, and its own consumer surveys that consumers were not receiving the value, savings, offset, energy efficiency savings, or energy production estimated from their sales proposals or that the salespeople claimed as described in sections IV.Z and EE.

726.    As a result, GoodLeap's delegation encompassed the deceptive advertising, marketing, and sales practices described in sections IV.I-K, N, P, and T-EE that occurred during the March 2018 to October 2022 period it made loans for Power Home purchases.

727.    GoodLeap accepted over 1,000 loan agreements with Virginians to finance consumer purchases of Power Home's systems from March 2018 through 2022 through these deceptive acts and practices.

728.    Conversely, GoodLeap avoided rejecting loan agreements with consumers despite its awareness of deceptive practices, as alleged in part in section IV.W.

729.    GoodLeap is liable for these deceptive acts or practices because it engaged in them.

127

730.    GoodLeap is also liable for Power Home's deceptive acts or practices with respect to GoodLeap loans because it granted actual agency to Power Home to engage in them: it authorized Power Home to engage in advertising, marketing, and sales, subject to its control of the content of those materials, including sales proposals; it trained salespeople; it obtained and reviewed sales training materials and proposals; it integrated its loan platform into sales proposals; and  it controlled pricing, including raising price limits at Power Home's request, all of which led to the consumer deception and harm alleged here.

731.    GoodLeap is also liable for Power Home's deceptive acts or practices with respect to GoodLeap loans because it ratified them, receiving, retaining, and not repudiating the benefits of those practices when it accepted and enforced Virginia loan agreements. It knew material facts about how those agreements were advertised, marketed, and sold from the sales presentations and proposals it repeatedly reviewed and audited. It even repeatedly identified deceptive practices in its audits, including identifying overinflated utility escalators in July through December 2018 and identifying misrepresentation of "savings" in June 2022. It had hundreds of consumer complaints about deceptive marketing and sales. Yet it continued to issue loans to consumers upon whom these deceptions recurred. Ultimately, it received and retained the benefits of loan agreements rooted in deceptive practices yet did not repudiate them for fraud, misrepresentation, or deception.

732.    GoodLeap conspired with Power Home to engage in deception by agreeing to use utility rate escalators that it knew were inaccurate from November 2018 to February 2021.

733.    GoodLeap aided and abetted Power Home by permitting the continued use of deceptive utility rate escalators from November 2018 to February 2021, by permitting the use of long-term savings estimates from March 2018 to February 2021, and by permitting the continued

use of misrepresentations of consumer savings in sales proposals from June 2022 to September 2022.

734.    Finally, as described in section V.F, the Holder Rule also makes GoodLeap liable to consumers for the seller's deceptive practices for the loans it holds.

**F.  Mosaic's Liability**

735.    Mosaic engaged in deception in violation of 12 U.S.C. § 5536(a)(1)(B) by authorizing, adopting, and ratifying the deceptive marketing, promotions, advertising, and sale of its loans and the loans it arranged and brokered for other lenders.

736.    Mosaic delegated to Power Home the advertising, marketing, promotion, and sale subject to its control, of loans it funded, brokered, or arranged, as alleged in sections IV.B, L, O, Q-T, and DD.  As described in section IV.B, Mosaic described Power Home's role as "selling the Mosaic loan" and "selling Mosaic," and its Program Agreement specifically provided Power Home's "sales force will be responsible for . . . promoting and facilitating access to" Mosaic's loans.

737.    Mosaic delegated to Power Home the responsibility to "walk the consumer through the process" of credit applications, loan applications, reviewing the terms of the loan application and the Truth in Lending Act disclosure statement, discussion (if any) of loan terms, and loan agreement execution as described in sections IV.B and Q.

738.    Conversely, Mosaic avoided direct communication with consumers until after consumers signed loan agreements and, when it did talk to them, it did so with Power Home's salespeople in the room as described in section IV.B.

739.    Mosaic knew the advertising, marketing, and sales pitch used to sell its loans; repeatedly and regularly met with Power Home's sales managers, sales trainers, and sales staff;

reviewed both Power Home's sales pitch and its process for conducting credit applications, loan applications, and loan execution; and repeatedly met and emailed with Power Home to discuss joint marketing and lead generation initiatives as described in sections IV.B, L, Q, and S-T.

740.    Mosaic also obtained and reviewed Power Home's sales proposals and brochures and integrated its lending platform into those proposals as described in section IV.S.

741.    The sales materials Mosaic obtained and reviewed showed every step of the sales pitch and proposal during the 2017 to 2021 period it funded, arranged, or brokered consumer loans.

742.    Mosaic knew salespeople had misrepresented the performance of and savings from loan-backed solar purchases as described in section IV.EE.

743.    Mosaic knew from consumer complaints that consumers were not receiving the value, savings, offset, energy efficiency savings, or energy production estimated from their sales proposals or that the salespeople claimed as described in sections IV.Z and EE.

744.    As a result, Mosaic's delegation encompassed the deceptive advertising, marketing, and sales practices described in sections IV.S-DD that occurred during the February 2017 to June 2021 period it funded, arranged, or brokered loans for Power Home purchases.

745.    Mosaic accepted over 700 loan agreements with Virginians to finance consumer purchases of Power Home's systems through these deceptive acts and practices.

746.    Mosaic is liable for these deceptive acts or practices because it engaged in them.

747.    Mosaic is also liable for any deceptive acts or practices conducted by Power Home because it had an actual agency relationship with respect to Power Home's advertising, marketing, and sales of Mosaic's loans: it authorized Power Home to engage in advertising, marketing, and sales, subject to its control of the content of advertisements, marketing, and sales materials, including sales proposals; it trained salespeople and participated in sales meetings and trainings;

it obtained and reviewed sales training materials and proposals; it integrated its loan platform into sales proposals; and it controlled pricing, all of which led to the consumer deception and harm alleged here.

748.    Mosaic is also liable for any deceptive acts or practices conducted by Power Home because it ratified Power Home's deceptive advertising, marketing, and sales practices by receiving, retaining, and not repudiating the benefits of those practices when it accepted and enforced Virginia loan agreements. It knew the material facts of how those agreements were advertised, marketed, and sold from the sales presentations, proposals, and materials it obtained and reviewed and sales trainings it participated in.

749.    The Holder Rule also makes Mosaic liable to consumers for the seller's deceptive practice for loans it holds.

### G.  Sunlight's Liability

750.    Sunlight engaged in deception in violation of 12 U.S.C. § 5536(a)(1)(B) by authorizing, adopting, and ratifying the deceptive marketing, promotions, advertising, and sale of loans it arranged and brokered.

751.    Sunlight delegated to Power Home the advertising, marketing, promotion, and sale of loans it arranged and brokered, subject to its control, including responsibility for consumer credit and loan applications, discussion (if any) of loan terms, and loan agreement execution, as described in sections IV.B, L, O and Q-T.

752.    Sunlight knew the advertising, marketing, and sales pitch used to sell its loans; repeatedly and regularly met with Power Home staff to train them; and reviewed both Power Home's sales pitch and its process for conducting credit checks, loan applications, and loan execution, as described in sections IV.B, L, O, Q, and S-T.

131

753.    Sunlight also obtained and reviewed Power Home's sales proposals and integrated its lending platform into those proposals as described in section IV.S.

754.    Sunlight knew salespeople misrepresented the performance of and savings from loan-backed solar purchases as described in section IV.EE.

755.    Sunlight was on notice from consumer complaints that consumers were not receiving the value, savings, offset, energy efficiency savings, or energy production estimated from their sales proposals or that the salespeople claimed as described in sections IV.Z and EE.

756.    The advertising, marketing, and sales materials Sunlight obtained and reviewed showed every step of the sales pitch and proposal during the 2018 to 2022 period it brokered and arranged consumer loans.

757.    Ultimately, Sunlight's delegation encompassed the deceptive advertising, marketing, and sales practices described in sections IV.I-K, N, P, and T-EE that occurred during the 2018 to 2022 period it brokered and arranged loans for Power Home purchases.

758.    Sunlight brokered and arranged over 900 loan agreements with Virginians to finance purchases of Power Home's systems from 2018 through 2022 through these deceptive acts and practices.

759.    Sunlight is liable for these deceptive acts or practices because it engaged in them.

760.    Sunlight is also liable for Power Home's deceptive acts or practices because it granted actual agency to Power Home to engage in them: it authorized Power Home to engage in advertising, marketing, and sales, subject to its control of the content of advertisements, marketing, and sales materials, including sales proposals; it trained salespeople and participated in sales meetings and trainings; it obtained, reviewed, commented on, and edited sales training materials and proposals; it integrated its loan platform into sales proposals; and it controlled pricing,

132

including raising price limits at Power Home's request, all of which led to the consumer deception and harm alleged here.

761.    Sunlight is also liable for any deceptive acts or practices conducted by Power Home because it ratified Power Home's deceptive advertising, marketing, and sales practices by receiving, retaining, and not repudiating the benefits of those practices when it arranged, brokered, and serviced Virginia loan agreements.

**H.  Cross River Bank's Liability**

762.    Cross River Bank engaged in deception in violation of 12 U.S.C. § 5536(a)(1)(B) by authorizing, adopting, and ratifying the deceptive marketing, promotions, advertising, and sale of loans it arranged and brokered.

763.    It delegated to Power Home and Sunlight the advertising, promotion, marketing, and sale of its loans subject to its and Sunlight's control as described in sections IV.B, L, O and Q-T.

764.    It delegated to Power Home and Sunlight responsibility for consumers' credit applications, loan applications, presentation of loan terms and loan disclosures, and loan execution as described in sections IV.B and S.

765.    It knew or should have known the advertising, marketing, and sales pitch used to sell its loans as described in sections IV.B, L, O, Q, and S.

766.    It authorized price limit increases and the creation of 25-year loans to accommodate higher prices from the sale of batteries as described in sections IV.E. and F.

767.    Ultimately, Cross River Bank's delegation encompassed the deceptive advertising, marketing, and sales practices described in sections IV.I-K, N, P, T-X, and AA-EE that occurred during the 2018 to 2022 period it made loans for Power Home purchases.

133

768.    Cross River Bank accepted over 200 loan agreements in Virginia to finance consumer purchases of Power Home's systems from 2018 through 2022 through these deceptive acts and practices.

769.    Cross River Bank is liable for these deceptive acts or practices because it engaged in them.

770.    Cross River Bank is also liable for Power Home's deceptive acts or practices because it granted actual agency to Power Home to engage in them: it authorized Power Home and Sunlight to engage in advertising, marketing, and sales, subject to its and Sunlight's control of the content of advertisements, marketing, and sales materials, including sales proposals.

771.    Cross River Bank is also liable for any deceptive acts or practices conducted by Power Home because it ratified Power Home's deceptive advertising, marketing, and sales practices by receiving, retaining, and not repudiating the benefits of those practices when it accepted over 200 Virginia loan agreements.

772.    The Holder Rule also makes Cross River Bank liable to consumers for the seller's deceptive practice for loans it holds.

**I.    Technology Credit Union's Liability**

773.    Technology Credit Union engaged in deception in violation of 12 U.S.C. § 5536(a)(1)(B) by authorizing, adopting, and ratifying the deceptive marketing, promotions, advertising, and sale of loans it arranged and brokered.

774.    It delegated to Power Home and Sunlight the advertising, promotion, marketing, and sale of its loans subject to its and Sunlight's control as described in sections IV.B, L, O and Q-T.

775. It delegated to Power Home and Sunlight responsibility for consumers' credit applications, loan applications, presentation of loan terms and loan disclosures, and loan execution as described in sections IV.B and S.

776. It knew or should have known the advertising, marketing, and sales pitch used to sell its loans as described in sections IV.B, L, O, Q, and S.

777. It authorized price limit increases and the creation of 25-year loans to accommodate higher prices from the sale of batteries as described in sections IV.E. and F.

778. Ultimately, Technology Credit Union's delegation encompassed the deceptive advertising and marketing practices described in sections IV.I-K, N, P, T-X, and AA-EE that occurred during the 2018 to 2022 period it made loans for Power Home purchases.

779. Technology Credit Union accepted over 600 loan agreements to finance Virginia consumer purchases of Power Home's systems from 2018 through 2022 through these deceptive acts and practices.

780. Technology Credit Union is liable for these deceptive acts or practices because it engaged in them.

781. Technology Credit Union is also liable for Power Home's and Sunlight's deceptive acts or practices because it granted actual agency to Power Home to engage in them: it authorized Power Home and Sunlight to engage in advertising, marketing, and sales, subject to its and Sunlight's control of the content of advertisements, marketing, and sales materials, including sales proposals.

782. Technology Credit Union is also liable for any deceptive acts or practices conducted by Power Home because it ratified Power Home's deceptive advertising, marketing,

and sales practices by receiving, retaining, and not repudiating the benefits of those practices when it accepted over 600 Virginia loan agreements.

783.    The Holder Rule also makes Technology Credit Union liable to consumers for the seller's deceptive practice for loans it holds.

### J.  Messrs. Waller and Klink's Liability

784.    Messrs. Waller and Klink engaged in deception in violation of 12 U.S.C. § 5536(a)(1)(B) by directing, managing, and actively participating in Power Home's acts and practices as described in section IV.A, C-F, H, M-N, R, U-W, Y, AA, CC-EE making them liable for the deceptive marketing, promotion, advertising, and sales of solar systems and loans described in sections IV.I-K, N, P, T-X, AA-EE.

### Count II: Hidden Loan Fees in Violation of the Federal Consumer Financial Protection Act, 12 U.S.C. § 5536(a)(1)(A), Truth in Lending Act and Regulation Z

### (Against Defendants Dividend, GoodLeap, Mosaic, Cross River Bank and Technology Credit Union)

785.    Plaintiff realleges paragraphs 1-784.

## A.  Relevant Law

786.    The federal Consumer Financial Protection Act provides in part: "It shall be unlawful for (1) any covered person or service provider – (A) to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law[.]" 12 U.S.C. § 5536(a)(1)(A).

787.    "Federal consumer financial laws" means certain "enumerated consumer laws" including the Truth in Lending Act as well as "any rule or order prescribed by the [Consumer

136

Financial Protection] Bureau under this title, an enumerated consumer law, or pursuant to authorities transferred to" the Bureau.  12 U.S.C. § 5481(12, 14).

788.    Regulation Z, 12 C.F.R. § 1026.1 *et seq.*, is the Truth in Lending Act's implementing regulation and is a rule or order prescribed by the Bureau, by an enumerated consumer law, and by an authority transferred to the Bureau under 12 U.S.C. § 5581.

789.    The Truth in Lending Act's declared purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit . . . ." 15 U.S.C. § 1601(a*); see also Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322, 326 (6th Cir. 2001) ("TILA endeavors to enable consumers to evaluate credit offers separately from the purchase of merchandise, and thereby to create an active market providing more efficient credit prices.").

790.    The Truth in Lending Act in relevant part defines "creditor" as

only . . . a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.  15 U.S.C. § 1602(g).  *See also* 12 C.F.R § 1026.2(a)(17) (Regulation Z definition).

791.    Both the Truth in Lending Act and Regulation Z require creditors to disclose the amount financed, finance charge, annual percentage rate, loan term, payment schedule, and total amount of payments. 15 U.S.C. § 1638(a)(2-6); 12 C.F.R. § 1026.18(b-h).

792.    Disclosures must be accurate.  *See* 15 U.S.C. § 1631(c-d); 12 C.F.R. § 1026.17(c) (Regulation Z requires that "the disclosures shall reflect the terms of the legal obligation between the parties.").

793.    The Truth in Lending Act and Regulation Z both specify how the "amount financed" should be calculated.  (The Act permits the Bureau to use terminology different from the Act if it conveys substantially the same meaning.  15 U.S.C. § 1632(a).)

794.    The Truth in Lending Act provides:

The "amount financed", using that term, which shall be the amount of credit of which the consumer has actual use. This amount shall be computed as follows, but the computations need not be disclosed and shall not be disclosed with the disclosures conspicuously segregated in accordance with subsection (b)(1): (i) take the principal amount of the loan or the cash price less downpayment and trade-in; (ii) add any charges which are not part of the finance charge or of the principal amount of the loan and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to section 1605 of this title; and (iii)subtract any charges which are part of the finance charge but which will be paid by the consumer before or at the time of the consummation of the transaction, or have been withheld from the proceeds of the credit.  15 U.S.C. § 1638(a)(2)(A).

795.    Regulation Z similarly provides:

The amount financed is calculated by (1) Determining the principal loan amount or the cash price (subtracting any downpayment); (2) Adding any other amounts that are financed by the creditor and are not part of the finance charge; and (3) Subtracting any prepaid finance charge. 12 C.F.R. § 1026.18.

796.    As authorized by the Truth in Lending Act, Regulation Z requires creditors to separately itemize the amount financed, including "any amounts paid to other persons by the creditor on the consumer's behalf."  15 U.S.C. § 1638(a)(2)(B); 12 C.F.R. § 1026.18.

797.    The Truth in Lending Act defines the finance charge as the

sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction.  15 U.S.C. § 1605(a).

798.    Regulation Z similarly defines the finance charge as

the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident

to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction. 12 C.F.R. § 1026.4(a).

799. The annual percentage rate "is a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made." 12 C.F.R. § 1026.22(a)(1).

800. However, the Truth in Lending Act and Regulation Z exempt certain loans above a threshold amount that is annually adjusted for inflation, unless they are secured by any real property. 15 U.S.C. § 1603(3); 12 C.F.R. § 1026.3(b)(1)(i). For example, effective January 1, 2022, the threshold amount was $61,000. This Count does not apply to loans above that threshold.

**B. Violations**

801. Dividend, GoodLeap, Mosaic, Cross River Bank, and Technology Credit Union are all creditors under 15 U.S.C. § 1602(g) and 12 C.F.R § 1026.2(a)(17) because they regularly made consumer solar purchase loans payable by written agreement in over four installments. Their loans were generally payable in monthly installments over 20 years (or 240 monthly installments) and 25 years (300 monthly installments).

802. Each made loans below the threshold amounts that are subject to (and not exempt from) the Truth in Lending Act and Regulation Z.

803. As described in section V, Dividend, GoodLeap, Mosaic, Cross River Bank, and Technology Credit Union, each imposed a hidden fee as a condition of financing on the loan products they offered to consumers who financed their Power Home Solar purchase through them.

804. Consumers paid the hidden fees as described in section V.

805. Power Home "rolled" the fee into a "higher system price," charging loan consumers more than cash consumers as described in section V.

139

806.    The hidden fees were a finance charge under 15 U.S.C. § 1605(a) and 12 C.F.R. § 1026.4(a): they were paid and payable directly or indirectly by the consumer; they were incident to and a condition of the loan, the extension of credit; they were imposed directly or indirectly by the lenders, the creditor; and these fees did not exist in a comparable cash transaction, a cash purchase from Power Home.

807.    Consumers also had to pay interest accruing on the amount of the hidden fee over the course of the loan term, so many had to pay 20 or 25 years of interest on these fees.

808.    The hidden fees do not meet any statutory or regulatory exceptions to the Truth in Lending Act's definition of a finance charge.

809.    The hidden fees or the effect of the fees on the offered interest rate were not disclosed prior to the execution of the loan agreements.

810.    Dividend, GoodLeap, Mosaic, Cross River Bank, and Technology Credit Union violated 15 U.S.C. § 1638(a)(3) and 12 C.F.R. § 1026.18(d) by omitting the hidden fees from the Finance Charge in their Truth in Lending Disclosure Statements as described in section V.

811.    Dividend, GoodLeap, Mosaic, Cross River Bank, and Technology Credit Union violated 15 U.S.C. § 1638(a)(2)(A) and 12 C.F.R. § 1026.18(b) by overstating the Amount Financed in their Truth in Lending Disclosure Statements as described in section V.

812.    Dividend, GoodLeap, Mosaic, Cross River Bank, and Technology Credit Union violated 15 U.S.C. § 1638(a)(4) and 12 C.F.R. § 1026.18(e) by understating the Annual Percentage Rate in the Truth in Lending Disclosure Statements they provided to consumers as described in section V.

813.    Dividend, GoodLeap, Mosaic, Cross River Bank, and Technology Credit Union violated 15 U.S.C. § 1638(a)(2)(B) and 12 C.F.R. § 1026.18(c) by overstating the amount they

140

paid Power Home Solar on behalf of consumers in the Itemization of the Amount Financed in their Truth in Lending Disclosure Statements as described section V.

814.    Each of Dividend, GoodLeap, Mosaic, Cross River Bank, and Technology Credit Union's violations of the Truth in Lending Act and Regulation Z violates the Consumer Financial Protection Act, 12 U.S.C. § 5536(a)(1)(A), by offering loans that do not comply with federal consumer financial laws.

**Count III: Deception About Hidden Loan Fees in Violation of the Consumer Financial Protection Act, 12 U.S.C. § 5536(a)(1)(B)**

**(Against Defendants Dividend, GoodLeap, Mosaic, Sunlight, Cross River Bank, and Technology Credit Union)**

815.    Plaintiff realleges paragraphs 1-814.

816.    By hiding their loan fees, Dividend, GoodLeap, Mosaic, Sunlight, Cross River Bank, and Technology Credit Union engaged in deceptive acts and practices in violation of 12 U.S.C. § 5536(a)(1)(B), which provides in relevant part: "It shall be unlawful for – (1) any covered person or service provider . . . (B) to engage in any unfair, deceptive, or abusive act or practice[.]" 12 U.S.C. § 5536(a)(1)(B).

817.    As described in section V, the fees were hidden and omitted in sales proposals and presentations, in Power Home's purchase agreements, in Truth in Lending Act Disclosures, in summaries of loan terms, and in loan agreements.

818.    As described generally in section IV.B and S and alleged in Count I, Dividend, GoodLeap, Mosaic, Sunlight, Cross River Bank, and Technology Credit Union delegated, authorized, and approved the use of sales proposals to sell their loans and present their loan terms and costs.

819.    The hidden loan fees were material: they misrepresented the purchase price of the solar system; they misrepresented the loan principal; they misrepresented the actual loan annual percentage rate and fees; they ranged from 8% up to 30% of the loan amount (without the fee); they amounted to thousands of dollars, and in many cases, over $10,000; consumers paid interest on these fees for the length of the loan term, often 20 or 25 years; and hiding or omitting fees prevented consumers from understanding the actual or comparative value and costs of loans and purchases as described in section V.

**Count IV: Deception about Value, Savings, Costs, and Risks in Violation of the Virginia Consumer Protection Act, Va. Code § 59.1-200 (Against Dividend, Mosaic, Sunlight, Klink, and Waller)**

820.    Plaintiff realleges paragraphs 1-819.

821.    Virginia Code § 59.1-197 provides that the Virginia Consumer Protection Act is to be applied as remedial legislation to promote fair and ethical standards of dealings between suppliers and the consuming public.

822.    Virginia Code § 59.1-198 defines "consumer transaction" as "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes."

823.    Virginia Code § 59.1-198 defines "supplier" to mean "a seller . . . who advertises, solicits, or engages in consumer transactions."

824.    Virginia Code § 59.1-199 has certain exclusions to the Virginia Consumer Protection Act, including under subdivision (3) "Those aspects of a consumer transaction that are regulated by the Federal Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq." and under subdivision (4) banks, credit unions, and Commonwealth-licensed mortgage lenders.

825.    In part, Virginia Code § 59.1-200 provides:

142

A.    The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:

    . . .

5.  Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

    . . .

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]

826.    The sale of residential solar products and residential solar loans are "consumer transactions," as defined in Virginia Code § 59.1-198, because they are goods or services to be used primarily for personal, family, or household purposes.

827.    Dividend, Mosaic, Sunlight, and Power Home are "suppliers" as defined in Virginia Code § 59.1-198 and applied in Virginia Code § 59.1-200 because they were sellers of residential solar products or solar loans who advertised, solicited, and engaged in "consumer transactions" as described in sections III.A, IV.A-B, and Count I.

828.    Dividend, Mosaic, Sunlight, and Power Home are not excluded from the Virginia Consumer Protection Act because they were not banks, credit unions, or licensed mortgage lenders from 2017 to October 2022.

829.    As described in section IV and alleged in Count I, Dividend, Mosaic, Sunlight, and Power Home's advertising, marketing, and sales practices misrepresented the characteristics, uses, or benefits of solar systems and loans in violation of Virginia Code § 59.1-200 subsection (A)(5).

830.    As described in section IV and alleged in Count I, Dividend, Mosaic, Sunlight and Power Home's advertising, marketing, and sales practices used deception, fraud, false promises, or misrepresentation in violation of Virginia Code § 59.1-200(A)(14).

831.    Messrs. Klink and Waller are each individually liable as a "person" under the Virginia Consumer Protection Act for their active participation in Power Home's violations of 59.1-200(A)(5) and (A)(14).

832.    Dividend, Mosaic, Sunlight, and Messrs. Klink, and Waller willfully engaged in the acts and practices described in this Count in violation of the Virginia Consumer Protection Act.

833.    Individual consumers have suffered losses as a result of these violations of the Act.

## Count V: Deception about Hidden Loan Fees in Violation of the Virginia Consumer Protection Act, Va. Code § 59.1-200

### (Against Dividend, Mosaic, and Sunlight)

834.    Plaintiff realleges paragraphs 1-833.

835.    As described in section V and alleged in Count II, Dividend, Mosaic, and Sunlight used deception, fraud, false pretenses, false promises or misrepresentations in connection with a consumer transaction by hiding, omitting, and misrepresenting loan fees in violation of Virginia Code § 59.1-200(A)(14).  However, this allegation applies only to those loans whose amounts exceed the threshold set by 12 C.F.R. § 1026.3.

836.    Dividend, Mosaic, and Sunlight willfully engaged in the acts and practices described in this Count in violation of the Virginia Consumer Protection Act.

837.    Individual consumers have suffered losses as a result of these violations of the Act.

### VII. Prayer for Relief

838.    Wherefore, Plaintiff respectfully requests the Court to enter judgment in favor of the Plaintiff and against the Defendants for the following relief:

839.    As authorized by 12 U.S.C. § 5565(a)(2)(G) and Virginia Code § 59.1-203(A), permanently enjoin the Defendants, their employees, officers, directors, members, managers,

agents, successors, assignees, and all other persons acting on their behalf, in concert, or in participation with them, from engaging in any unfair, deceptive, or abusive acts or practices in violation of the Virginia Consumer Protection Act and the federal Consumer Financial Protection Act as alleged in this Complaint.

840.    As authorized by 12 U.S.C. § 5565(a)(2)(G) and Virginia Code § 59.1-203(A), order such other injunctive relief as may be necessary to ensure the Defendants' further compliance with the federal and state laws alleged in this Complaint.

841.    As authorized by 12 U.S.C. § 5565(a)(2)(A), order the loan contracts between the Defendants and Virginia consumers procured by the Defendants' deceptive acts or practices to be void, rescinded, limited, or reformed as necessary to redress injury to affected consumers.

842.    As authorized by 12 U.S.C. § 5565(a)(2)(B) and (C) and Virginia Code § 59.1-205, order the Defendants to pay consumer restitution or refunds to Virginia consumers based on the violations of law alleged in this Complaint.

843.    As authorized by 12 U.S.C. § 5565(a)(2)(D) and (E), order the Defendants to pay disgorgement, compensation for unjust enrichment, payment of damages, or other monetary relief for violations of the Consumer Financial Protection Act.

844.    As authorized by Virginia Code § 59.1-206(A), order the Defendants to pay civil penalties for each separate violation of the Virginia Consumer Protection Act.

845.    As authorized by 12 U.S.C. § 5565(a)(2)(H) and (c), order the Defendants to pay civil penalties for each separate violation of the federal Consumer Financial Protection Act.

846.    As authorized by 12 U.S.C. § 5565(b) and Virginia Code § 59.1-206(C), order the Defendants to pay Plaintiff his attorneys' fees and reasonable costs and expenses accrued in the investigation and prosecution of this action.

847.    Award such other relief that the Court deems just and appropriate.

**COMMONWEALTH OF VIRGINIA,
EX REL. JASON S. MIYARES,
ATTORNEY GENERAL**


By: _____ /s/ _____
            Geoffrey L. Ward

Jason S. Miyares
Attorney General

Steven G. Popps
Chief Deputy Attorney General

Richard S. Schweiker, Jr.
Senior Assistant Attorney General and Chief
Consumer Protection Section

Mark S. Kubiak
Senior Assistant Attorney General and Unit Manager
Charitable Solicitations and Deceptive Conduct Unit

Geoffrey L. Ward (VSB No. 89818)
Senior Assistant Attorney General
Chandler P. Crenshaw (VSB No. 93452)
Assistant Attorney General and Unit Manager
Office of the Attorney General of Virginia
202 N. Ninth Street
Richmond, Virginia 23219
Phone: (804) 371-0817
Fax: (804) 786-0122
gward@oag.state.va.us
ccrenshaw@oag.state.va.us

*Attorneys for Plaintiff*